**RESOLUTION TRUST CORPORATION, as Conservator for Commonwealth Federal Savings Bank, Plaintiff–Appellee,**

v.

**MAPLEWOOD INVESTMENTS, A Virginia General Partnership; James D. Heatwole, Ruby A. Heatwole; Nathan H. Miller; Kimberly H. Miller, Defendants–Appellants.**

**RESOLUTION TRUST CORPORATION, as Conservator for Commonwealth Federal Savings Bank, Plaintiff–Appellant,**

v.

**MAPLEWOOD INVESTMENTS, A Virginia General Partnership; James D. Heatwole, Ruby A. Heatwole; Nathan H. Miller; Kimberly H. Miller, Defendants–Appellees.**

Nos. 93–1301, 93–1346.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 26, 1993.

Decided July 28, 1994.

**ARGUED:** Charles F.B. McAleer, Jr., Hazel & Thomas, P.C., Alexandria, VA, for appellants. Steven Martin Gombos, Lowe & Associates, P.C., Alexandria, VA, for appellee.

**ON BRIEF:** Thomas C. Junker, Hazel & Thomas, P.C., Alexandria, VA, for appellants. Robert J. Lowe, Jr., Seth C. Berenzweig, Lowe & Associates, P.C., Alexandria, VA, for appellee.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

Reversed and remanded by published opinion. Senior Judge KAUFMAN wrote the majority opinion, in which Judge MURNAGHAN concurred. Judge NIEMEYER wrote a dissenting opinion.

## OPINION

FRANK A. KAUFMAN, Senior District Judge:

This case arises from a foreclosure sale of property posted to secure debt incurred by Maplewood Investments, a Virginia general partnership, and guaranteed by several individual debtors who were residents of Virginia.[1] Maplewood contends that the sale of the property was improper because of a conflict of interests on the part of the trustee and its officers, and that, as a result, the Resolution Trust Corporation ("RTC"), successor in interest to the creditor-purchaser, is barred from obtaining a deficiency judgment for the outstanding debt from Maplewood. The district court rejected Maplewood's assertions of conflict and entered judgment in favor of the RTC, a decision from which Maplewood appeals. In so doing, the district court also held that the RTC was not a holder in due course and therefore, on that independent ground, was not entitled to victory below. The RTC cross-appeals that latter determination. For the reasons set forth *infra*, we disagree with the district court's holding with regard to the conflict-of-interests question but agree with that court

---

1. Maplewood Investments and the individual guarantors are sometimes referred to collectively herein as "Maplewood."

in connection with the holder-in-due-course issue. Accordingly, we reverse the judgment below.[2]

## I.

On November 30, 1987, Maplewood executed a promissory note ("Note") in the amount of $365,250.00 in favor of Commonwealth Savings Bank of Virginia, F.S.B. ("Commonwealth"). The Note was individually guaranteed and also was secured by a Deed of Trust dated November 30, 1987, which was recorded as a first lien on three parcels of property in Prince William County, Virginia. On that date, the said real property was owned by Maplewood and zoned for commercial use. The trustee named under the Deed of Trust was Progressive Housing Service Corporation, a Virginia corporation ("Progressive"). At all times which are relevant in the within action, Progressive was a wholly owned subsidiary of Commonwealth. Charles W. Whittaker served as president of both Progressive and Commonwealth. Another officer of Progressive, John M. Tyler, Jr., was also the executive vice president of Commonwealth, and the counsel and registered agent for Progressive, Charles F. Sievers, served in that same capacity for Commonwealth.

Commonwealth subsequently notified Maplewood and the individual guarantors of default under the Note by a letter dated February 7, 1991. In a subsequent letter dated May 24, 1991, Sievers informed Maplewood of Commonwealth's intent to foreclose upon the property, and on June 7, 1991, the property was sold by the trustee to Commonwealth for $277,300, or approximately 70 percent of Maplewood's indebtedness, leaving a deficiency of approximately $118,803.60 owed by Maplewood and the guarantors. Apparently, Commonwealth, employing its standard practice to set a percentage of outstanding indebtedness as the amount it would bid, determined prior to the sale to offer approximately 70% of the debt owed and so informed Maplewood. Maplewood contends that the amount paid for the property fell substantially below the property's fair market value. Sievers, acting on behalf of Commonwealth and Progressive, conducted the sale. Prior to the sale, Whittaker apparently discussed with unidentified persons the amount Commonwealth would bid for the property.

Although Whittaker did not attend the sale, he seems to have acted at various times

**2.** Although Maplewood has not opposed the RTC's cross-appeal of the district court's rejection of holder-in-due-course status on the ground that the RTC lacks standing, the agency's cross-appeal was unnecessary because the RTC obtained a favorable judgment in the court below and seeks no modification of that award. In *Blum v. Bacon,* 457 U.S. 132, 137 n. 5, 102 S.Ct. 2355, 2359 n. 5, 72 L.Ed.2d 728 (1982), the Supreme Court wrote that "[a]ppellant argues that the statutory issue is not properly before us. It is well accepted, however, that without filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below." *See also Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 308–09, 1 L.Ed.2d 314 (1957). Earlier, Judge Craven, on behalf of this Court, stated:

We think the better rule is that a cross-appeal by defendants was unnecessary: since Blackwelder's claim was totally rejected as time-barred, Millman, without cross-appeal, "may support the judgment by urging any theory, argument, or contention which is supported by the record, even though it was specifically rejected by the lower court." 9 J. Moore, *Federal Practice* § 204.11[3], at 938 (2d ed.1953)[.]
. . . .

On the other hand, the rule is intended to preserve judicial resources, not to waste them. If the lower court's judgment terminating the lawsuit is sustainable on alternate grounds explicitly but erroneously rejected below, it serves no end to "reserve" the questions for a later appeal, and we decline to do so. *Blackwelder v. Millman,* 522 F.2d 766, 771–72 (4th Cir.1975); *see also St. John v. United States,* 951 F.2d 232, 233 n. 1 (9th Cir.1991) (stating that "an appellee is not precluded from filing a notice of appeal even if the judgment below is entirely favorable because of the risk that cross-appellants may become aggrieved upon reversal on the direct appeal"); *Jordan v. Duff and Phelps, Inc.,* 815 F.2d 429, 439 (7th Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988) (criticizing unnecessary cross-appeals but nonetheless concluding that "the propriety of the argument" raised still may be considered); 15A Wright, Miller & Cooper, *Federal Practice & Procedure* § 3904, at 199–201 (2d ed.1991).

We conclude that the RTC may rely upon its holder-in-due-course status even though its cross-appeal was not necessary. We therefore treat the cross-appeal as encompassed within the appeal and deny relief in connection with the cross-appeal in and of itself.

on behalf of Progressive as trustee of the property. The record also indicates that Whittaker discussed the amount to be bid with Sievers and Tyler, among others, although Judge Ellis, who conducted the bench trial below, declined to find that the latter two individuals participated in any such discussions.[3] At the sale, Tyler bid the predetermined amount and purchased the land for Commonwealth. Sievers accepted the bid.

Approximately nine months after the sale, on March 6, 1992, Commonwealth brought suit against Maplewood and the guarantors in the Circuit Court of Prince William County, Virginia, seeking a deficiency judgment in the remaining amount of the outstanding debt upon the promissory note. Shortly thereafter, on April 3, 1992, the Director of the Office of Thrift Supervision ("OTS") closed Commonwealth and appointed the RTC as Receiver for Commonwealth. The OTS created and chartered a new federal mutual savings association known as Commonwealth Federal Savings Bank ("Association"), with the RTC as Conservator. Also on April 3, 1992, the RTC, in its capacity as Receiver, entered into a purchase and assumption agreement[4] with the RTC Conservator pursuant to which certain assets and liabilities of Commonwealth were transferred to the Association, including the Note which is the subject of this federal action. The RTC Conservator succeeded to all right, title and interest in the Note pursuant to 12 U.S.C. § 1821(d)(2)(A).[5]

The RTC Conservator filed a Notice of Substitution in the Prince William County court on July 2, 1992, replacing the former plaintiff Commonwealth as successor-in-interest in that state court proceeding, and then removed the case to the United States District Court for the Eastern District of Virginia. On November 6, 1992, U.S. Senior District Judge Albert V. Bryan, Jr., sitting in that federal district court, granted the RTC's motion for summary judgment as to liability but reserved for trial the determination as to whether the RTC was entitled to any portion of the claimed deficiency. Judge Bryan, in so doing, however, rejected the RTC's contention that it was entitled to be treated as a holder in due course with regard to the Note. U.S. District Judge T.S. Ellis, III, who conducted a bench trial on December 9, 1992, entered judgment on January 12, 1993, for the RTC in the amount of $143,643.24.[6] Maplewood filed a motion pursuant to Fed. R.Civ.P. 52(b), asking the trial court to amend its findings of fact and conclusions of law. Judge Ellis granted that motion with regard to several of the proposed findings of fact and denied it as to the rest of the requested findings and as to certain proffered conclusions of law. Judge Ellis, in so ruling, reaffirmed his prior conclusion that the foreclosure sale complied with Virginia law, even in the light of the additional find-

---

3. *See* Part III of this Opinion, *infra.*

4. The RTC was appointed as Conservator in order to organize the new thrift and "not for the purpose of liquidation." "When a state agency declares a bank insolvent and appoints the FDIC [Federal Deposit Insurance Corporation] as receiver, ... [there are] two major alternatives[:] ... a straight liquidation ... and a P & A [purchase and assumption] transaction, in which an assuming bank purchases most of the failed bank's assets [and the deposit liabilities] and continues to operate the bank as a going concern." *Federal Deposit Ins. Corp. ("FDIC") v. Bank of Boulder*, 911 F.2d 1466, 1469 (10th Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). The same holds true in the within situation, in which the RTC Conservator is acting on behalf of the assuming thrift.

5. 12 U.S.C. § 1821(d)(2)(A) (1989) states as follows:

(2) General Powers
 (A) Successor to Institution
The Corporation [FDIC] shall, as conservator or receiver, and by operation of law, succeed to—
 (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution; and
 (ii) title to the books, records, and assets of any previous conservator or other legal custodian of such institution.
The RTC, upon its creation, inherited those same powers pursuant to 12 U.S.C. § 1441a(b)(4)(A) (1993). *See* note 27, *infra.*

6. That amount subsequently was amended to include attorney fees and costs, bringing the total awarded to $177,143.24.

ings, and left undisturbed Judge Bryan's determination denying to the RTC holder-in-due-course status. Judge Ellis subsequently denied Maplewood's motion for any further reconsideration. Maplewood filed its notice of appeal to this Court, and the RTC filed its notice of cross-appeal. Both appeals were timely filed.[7]

## II.

We are confronted with a number of issues in the within case. Initially, we must determine whether Judge Ellis was correct in rejecting Maplewood's conflict-of-interests defense. If he was correct in so doing, the judgment below in favor of the RTC would stand without this Court reaching the holder-in-due-course issues. However, if Judge Ellis wrongly rejected the conflict-of-interests assertions by Maplewood, we then must reach and decide a number of quite difficult questions. In so doing, we must ascertain against what type of holder and/or instrument the conflict-of-interests defense may be maintained successfully; whether the Note is non-negotiable and/or if the RTC qualifies as the equivalent of a holder in due course; and, finally, whether the involvement of a federal remedial agency such as the RTC, under the circumstances of this case, should lead us to accord the RTC what amounts to holder-in-due-course status and consequent immunity from the conflict defense.

## III.

Maplewood asserts various grounds upon which it claims this appellate Court should reverse Judge Ellis in connection with his rejection of the conflict-of-interests defense. Although Judge Ellis did consider the alleged conflict as a factor in ascertaining the fairness of the price paid for the property, in the end he decided that the price was fair and that the foreclosure sale was conducted properly. Maplewood contests those rulings and also claims, *inter alia,* that the sale suffered from procedural deficiencies other than the alleged conflict on the part of the trustee, including inadequate advertisement of the impending sale and the presence at the foreclosure sale of only one bidder. All of those purported deficiencies stem from, or are closely related to, the allegations of conflict of interests on the part of the trustee, Progressive, and particularly its officers and counsel.

As to inadequate advertisement, paragraph 19 of the Deed of Trust requires notice of a foreclosure sale to be published "once a week for two successive weeks in a newspaper having circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable." Progressive complied with the literal terms of the Deed; thus, any inference that its exercise of discretion not to advertise any further was improper appears dependent upon establishing allegations of conflict of interests on the part of the officers of the trustee—allegations which must be considered in the light of the fact that a trustee possesses "wide discretion as to the manner of advertisement." *Cromer v. De Jarnette,* 188 Va. 680, 51 S.E.2d 201, 203 (1949).

Similarly, Maplewood's claim that Sievers, counsel for both Commonwealth and Progressive and the person who conducted the sale, should have postponed the proceedings upon realizing that only one bidder—Commonwealth—was present, does not seem, by itself, to rise to a cognizable level of wrongdoing in the absence of a conflict of interests or "other inequitable circumstances." *Linney v. Normoyle,* 145 Va. 589, 134 S.E. 554, 555 (1926).

> When a trustee is faced with the question as to what is his duty in regard to an adjournment of a sale, we do not think that the criterion should be "that there is no bidder present except the creditor," but we are of the opinion that the criterion, under such circumstances, should be that there is no bidder present except the creditor who

7. We review the conclusions of law of both Judge Bryan and Judge Ellis *de novo, see, e.g.,In re Finney,* 992 F.2d 43, 44 (4th Cir.1993), and Judge Ellis's factual determinations made in the course of and after the bench trial on the basis of whether or not they are clearly erroneous. *See, e.g., Crawford v. Air Line Pilots Ass'n Int'l,* 992 F.2d 1295, 1297 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993).

offers a bid so grossly inadequate, which, if accepted, would amount to a sacrifice of the debtor's property.

*Id.*[8]

Maplewood asserts that the price paid by Commonwealth for the real estate was so low as to warrant correction by this Court. In *Rohrer v. Strickland,* 116 Va. 755, 82 S.E. 711, 712 (1914), the Supreme Court of Virginia stated that "where the price obtained for property at a trustee's sale is so grossly inadequate as to shock the conscience of the chancellor, the sale will be set aside." Although in the instant case, Maplewood appears to be seeking merely to avoid a deficiency judgment against it for that part of the total indebtedness still owed to the RTC after the sale, and seemingly is not attempting entirely to invalidate the sale itself, the same reasoning seems applicable. For instance, in *Linney,* the court applied the *Rohrer* test in favor of the debtors/former owners of the property even though those debtors were seeking from the administrator of the creditor the difference between the price for which the property was sold and the fair market value of that land, not the invalidation of the sale. *See Linney,* 134 S.E. at 554.

Additionally, in *Cromer,* Virginia's highest court noted that the appropriate standard for determination of value should not be that of fair market value, but rather should reflect more closely the circumstances of the sale—hence, only "the forced sale value, or foreclosure value." *Cromer,* 51 S.E.2d at 204. The price paid by Commonwealth for the property at issue in the instant case represented over half of the lower end of the fair-market-value figures provided by the parties and perhaps a much higher percentage of the forced sale value. In both *Rohrer* and *Linney,* the price paid constituted well under 40% of the relevant benchmarks. *See Linney,* 134 S.E. at 554; *Rohrer,* 82 S.E. at 711–12. Here, the price paid by Commonwealth appears to assume any noteworthy sinister aspect only when viewed in the light of the potential conflict of interests on the part of the officers of the trustee, and not because of any *per se* gross inadequacy of price.

■ Taking into account all of the factors discussed *supra,* we conclude that Judge Ellis wrongly determined that there was no cognizable conflict of interests on the part of the three men who played key roles in the sale. Whittaker, although not present at the foreclosure sale, was the president of both the trustee and the creditor and participated in the formulation of the bid, leading him afoul of Virginia law. *See* VA. CODE ANN. § 26–58 (Michie 1992).[9] In addition to the matter of Whittaker, Judge Ellis was required to confront the question of whether Sievers and/or Tyler transgressed that statute. Both men were present at the sale, and there is compelling evidence of the involvement of one or both of them in establishing the price bid for the property. In that context, it is the series of interlocking violations of responsibilities by both the trustee and the creditor—indicated by the parts played by those individuals involved in establishing the bid price and conducting the sale—which entitles Maplewood meritoriously to assert its conflicting interests defense. The indications that Sievers or Tyler participated in formulating Commonwealth's bid, the lack of any purchasers at the sale other than the creditor, and Sievers' dual loyalties to both Progressive and Commonwealth add up to too

---

8. The Supreme Court of Virginia in *Linney* wrote the above-quoted passage in the course of interpreting an earlier case, *Rohrer v. Strickland,* 116 Va. 755, 82 S.E. 711 (1914), in which that court took issue with the presence of only one bidder and concluded that the transaction was unconscionable. The court in *Linney* construed that earlier holding in *Rohrer* as relying upon both a conflict of interests on the part of the creditor and a gross inadequacy of the price paid. *See Linney,* 134 S.E. at 555.

9. VA. CODE ANN. § 26–58 (Michie 1992) (emphasis added) states in pertinent part:

> The mere fact that a trustee in a deed of trust to secure a debt due to a corporation is a stockholder, member, employee, officer or director of, or counsel to, the corporation does not disqualify him from exercising the powers conferred by the trust deed nor does it render voidable a sale by such trustee in the exercise of the powers conferred on him by the trust deed *so long as he did not participate in the corporation's decision as to the amount to be bid at the sale of the trust property.*

great a potential conflict of interests to ignore. Accordingly, we hold that the foreclosing creditor, the predecessor of the RTC, violated the relevant Virginia statutory provisions and that, in reaching the contrary resolution, Judge Ellis misapplied Virginia law.[10] That conclusion leads us to consider the additional issues referred to at the end of Part II of this Opinion and to determine whether Maplewood's conflict-of-interests defense is viable against the RTC.

## IV.

Virginia law would appear, at first blush, to govern the status of the Note at issue in this case.[11] The Note was executed in Virginia, secured by a deed of trust for land located in Virginia, and all of the parties to that Note reside in Virginia. *See* VA. CODE ANN. § 8.1–105 and offic. cmt. 2 (Michie 1991); *Capital Investors Co. v. Executors of Estate of Morrison,* 484 F.2d 1157, 1160 (4th Cir.1973). Additionally, the Deed of Trust, in paragraph 15, provides that "[t]his security instrument shall be governed by federal law *and* the law of the jurisdiction in which the Property is located." (emphasis added).

## V.

■ The conflict-of-interests defense advanced by Maplewood normally may succeed against the RTC only if the latter is not a holder in due course of the Note.

> [I]t is a defense against one not a holder in due course that the instrument was negotiated in breach of faith with the defendant. As to such a holder, or the holder of a nonnegotiable instrument, breach of faith in the inception or transfer of an

instrument is a defense to an action on the instrument against the party whose confidence has been violated, unless the holder is protected by an estoppel.

11 Am.Jur.2d *Bills & Notes* § 698 (1963) (footnotes omitted); *see also Commercial Trust Co. of New Jersey v. Kealey,* 92 F.2d 397, 401–02 (4th Cir.1937) (illustrating that a holder in due course who shows that he took the instrument without notice of a breach of faith is immune from that defect). Thus, the question arises as to whether the RTC warrants the protections of a holder in due course in the face of Maplewood's conflicting interests defense.

■ The fact that the conflict concerns an irregularity in connection with the foreclosure sale rather than with regard to the Note itself is not material. The conflict of which Maplewood complains constitutes a personal defense to which an ordinary holder would be subject when seeking to collect the debt evidenced by the Note. "[W]hatever tends to diminish the plaintiff's cause of action or to defeat recovery in whole or in part amounts to a defense." 11 Am.Jur.2d *Bills & Notes* § 651 (1963). An ordinary holder "takes title [in an instrument] subject to all equities and defenses which would be available as between the original parties." *Id.* at § 377. Virginia law provides that a holder who is not a holder in due course takes an instrument subject to "all defenses of any party which would be available in an action on a simple contract." VA. CODE ANN. § 8.3–306(b) (Michie 1991) (repealed 1993); *see also* VA. CODE ANN. § 8.3A–305(a)(2) (Michie 1993).[12] Here, Maplewood seemingly would have been able to assert against Com-

---

**10.** Given that conclusion, Maplewood's challenges to the refusal of Judge Ellis to adopt certain proposed additional findings of fact requested by Maplewood which may have provided further evidence of the existence of conflict of interests on the part of the trustee have become moot.

**11.** We herein analyze the Note and the viability of the conflicting interests defense against that Note under Virginia law even though the nature of a federal remedial agency such as the RTC implicates important federal interests which receive consideration later in this opinion. The conclusions reached in this case pursuant to Virginia law ultimately must be determined in the

light of federal interests, as evaluated under the three-pronged test of *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), and under the instruction of *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its offspring. It will be upon that basis that we finally determine whether Virginia law controls in this case. *See* Parts VIII and IX of this Opinion, *infra.*

**12.** § 8.3–306 was repealed and replaced in 1993 by § 8.3A–305. There seems to be no material difference between the relevant, cited sections of the two statutes.

monwealth the conflict defense during the original deficiency suit upon the Note, before the RTC's involvement, assuming that no statutory limitations or procedural bar precluded such a defense.

Virginia law in the field of negotiable instruments largely has patterned itself in recent years after the Model Uniform Commercial Code ("UCC" or "Model Code"). Herein, we note that Virginia's statutory provision regarding permissible defenses against a holder in due course in effect during the relevant time period corresponds exactly with that of the Model Code. *Compare* VA. CODE ANN. § 8.3–305 (Michie 1991) (repealed 1993) [13] *with* MODEL UCC § 3–305 (1990). Both Virginia's § 8.3–305 and the Model Code's § 3–305 provide as follows:

To the extent that a holder is a holder in due course he takes the instrument free from

(1) all claims to it on the part of any person; and

(2) all defenses of any party to the instrument with whom the holder has not dealt except

(a) infancy, to the extent that it is a defense to a simple contract; and

(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) discharge in insolvency proceedings; and

(e) any other discharge of which the holder has notice when he takes the instrument.

Of the limitations upon a holder in due course listed in both Virginia's § 8.3–305 and the Model Code's § 3–305, only three require comment—(2)(b), (2)(d), and (2)(e). In so doing, we look both to Virginia law and also to cases and commentaries which apply the Model UCC or a federal rule derived in part from the Model UCC to buttress our conclusions.

■ As to the exception noted in (2)(b), Virginia law deems that a conflict of interests such as that shown by Maplewood to exist in this case, *ie.*, a breach of faith or fiduciary duty by officers of the trustee, makes a transaction voidable by the plaintiff-debtor, not void, VA. CODE ANN. § 26–58,[14] thus rendering that defense useless against a holder in due course. *See* VA. CODE ANN. § 8.3–305 offic. cmt. 5;[15] *see also Linney*, 134 S.E. at 554 (seemingly recognizing that a conflict of the sort alleged in the within case rendered the conveyance "voidable" and therefore left no remedy against a subsequent "purchaser for value without notice," *ie.*, a holder in due course); *Lynchburg Nat'l Bank v. Scott*, 91 Va. 652, 22 S.E. 487, 488–90 (1895) (explaining that unless a defense causes an instrument to be void, it cannot be asserted against a holder in due course).

"Only when ... illegality renders a transaction void as opposed to merely voidable,

---

**13.** § 8.3–305 was repealed and replaced in 1993 by VA. CODE ANN. § 8.3A–305 (Michie 1993). § 8.3A–305(b) provides that a holder in due course is "subject to defenses of the obligor stated in subsection (a)(1)." § 8.3A–305(a)(1) lists the following:

(1) a defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings[.]

There seems to be no material difference between § 8.3A–305(a)(1) and § 8.3–305. In any event, the new section was passed in 1993, well after the final judgment in this case was delivered below. Accordingly, we will use the earlier provision in our analysis.

**14.** *See* note 9, *supra*, for text of statute.

**15.** That Comment states that "[i]f under the local law the effect is to render the obligation of the instrument entirely null and void, the defense may be asserted against a holder in due course. If the effect is merely to render the obligation voidable at the election of the obligor, the defense is cut off." VA. CODE ANN. § 8.3–305 offic. cmt. 5.

will these be defenses available against a holder in due course." 1 Comm. Law & Pract. Guide (MB) ¶ 15.09[3], at 15–27. A plaintiff who is a holder in due course and is "the transferee of a person who made the transfer in breach of his fiduciary duty" is not subject to such a personal defense on the part of the defendant. 6 Anderson, Unif. Comm.Code § 3–305:154, at 127 (3d ed.1993). Maplewood has offered no authority from any jurisdiction to the effect that the conflict of interests of which it complains would make the transfer void. Any conflict of the type alleged by Maplewood occurred with regard to "the underlying transaction," and not in connection with the Note itself, and, thus, constitutes a limited, personal defense against the validity of the transaction which is not cognizable against a holder in due course. *FDIC v. Wood,* 758 F.2d 156, 160 (6th Cir.1985), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985).

■ (2)(d) "is sufficiently lucid to require little elaboration. A bankrupt may be wholly discharged of all his debts under the United States Constitution and any relevant statutes. No state law, including that of the Uniform Commercial Code[,] may alter that process." Alphonse M. Squillante and John R. Fonseca, 2 *The Law of Modern Comm. Practices* § 5:29, at 81 (1981). Here, of course, the RTC did not acquire the Note directly from Maplewood, nor has Maplewood sought or obtained a discharge through bankruptcy proceedings of the debt evidenced by the Note at any relevant time of which this Court is aware.[16]

Finally, with regard to (2)(e), the notice exception, Maplewood has neither produced nor proffered any evidence, either before this Court or below, that the RTC had "actual knowledge" of the purported conflict of interests or of the default of the Note.[17] *Wood,* 758 F.2d at 161.

■ "[A] debtor [i]s required to produce affirmative evidence that the [RTC] had actual knowledge of the defens[e] in order to overcome th[e] presumption" that it had no such knowledge. *RTC v. Jet Stream, Ltd.,* 790 F.Supp. 1130, 1138 (M.D. Fla.1992). Maplewood avers that the RTC possessed notice of the default of the Note due to Commonwealth's institution of legal proceedings against Maplewood prior to the RTC's assumption of the thrift for the amount of the outstanding debt owed Commonwealth following the foreclosure sale. Nevertheless, that assertion does not satisfy the test laid out in *Wood* or in *Jet Stream,* because the RTC cannot "be charged with knowledge of a defense merely because that information could be found in the bank's files. Furthermore, actual knowledge must be shown as of the date the [RTC] entered into the purchase and assumption agreement." *Wood,* 758 F.2d at 162; *cf. Langley v. FDIC,* 484 U.S. 86, 92, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987) (noting that 12 U.S.C. § 1823, a statute dealing with the effect of side agreements which purport to diminish assets acquired by the FDIC, requires that agreements external to a note be made part of the bank record " 'contemporaneously' with the making of the note ... [to] ensure mature consideration of unusual loan transactions by

16. We note that Maplewood itself does not appear to have asserted this (2)(d) type of defense, either before the district court or in the within appeal.

17. The requirement of "actual knowledge," which has been adopted by courts dealing with federal remedial agencies such as the RTC, differs somewhat from the provisions of the UCC. MODEL UCC § 3–304(3) (1990), which is part of the UCC section which defines "notice," states that a "purchaser has notice that an instrument is overdue if he has *reason to know*" a variety of facts about the instrument (emphasis added). That language arguably may be interpreted to include some element of constructive notice which falls short of actual knowledge. Also,

MODEL UCC § 3–302 (1990) requires that, in order to become a holder in due course, a holder of an instrument must take that instrument "without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." § 3–302(1)(c). Both § 3–302 and § 3–305 are phrased similarly and both would appear to look to § 3–304 for their definition of the term "notice." Nonetheless, *to the extent that the Model UCC does appear to provide for some sort of constructive notice, it contravenes federal policies, discussed infra,* with regard to agencies such as the RTC. Under those policies, only actual knowledge would seem to suffice against the RTC. *But cf.* note 18, *infra* (notice may be irrelevant to validity of instrument held by the RTC or FDIC).

senior bank officials, and [to] prevent fraudulent insertion of new terms ... when a bank appears headed for failure").

■ In this case, Maplewood seeks to escape liability for the outstanding debt resulting from an allegedly improper foreclosure sale. The fact that Commonwealth filed suit to collect that deficiency prior to the RTC's assumption of the thrift does not necessarily signify that the agency actually knew of the suit, much less of the defenses to that suit, at the time the RTC took over Commonwealth, and the record does not support or even suggest such an inference. Consequently, as Maplewood has offered no affirmative evidence of relevant actual knowledge on the part of the RTC, we conclude that the notice exception embodied in (2)(e) is inapplicable in the within case.[18]

A conflict of interests such as that alleged herein by Maplewood is a personal defense "stemming from the underlying transaction," *i.e.*, the foreclosure sale, *Wood,* 758 F.2d at 160, and as such is not a tenable claim against a holder in due course under the Model Code.[19] *See* MODEL UCC § 3–305. Thus, we now must analyze the Note itself and determine whether the Note is a negotiable instrument under Virginia law,[20] and also whether the RTC satisfies the other requirements laid out by Virginia law or by federal law to be a holder in due course or to be treated as the equivalent of the same.

## VI.

■ The Note at issue, secured by a deed of trust and executed on November 30, 1987, provides for the accumulation of interest "at the CHASE MANHATTAN PRIME, plus 2%, adjusted and payable monthly, with a floor of 10.75% per annum." Maplewood undertook to pay the debt owed "to the order of" Commonwealth. The only question as to the Note's status as a negotiable instrument arises because of its provisions for the calculation of interest.[21] Since the Note was executed, Virginia law in this area has undergone several amendments. Prior to 1988, a note such as the one at issue here would have been regarded as a non-negotiable instrument, as "the amount required to satisfy the debt cannot be ascertained without reference to an extrinsic source—in this case the vary-

---

**18.** Additionally, we note that the Supreme Court of the United States, in applying 12 U.S.C. § 1823(e) in order to ascertain the effect of certain unrecorded agreements upon an instrument, stated that "knowledge ... is not relevant to whether § 1823(e) applies.... An agreement is an agreement whether or not the FDIC knows of it; and a voidable interest is transferable whether or not the transferee knows of the misrepresentation or fraud that produces the voidability." *Langley,* 484 U.S. at 94, 108 S.Ct. at 402–03; *see* note 30, *infra,* for text of statute. Of course, we are not faced in this appeal with a situation squarely within § 1823. No agreement as such is at issue. Nonetheless, it seems reasonable that that statement in *Langley* still might apply, inasmuch as some of the same policies in support of the work of federal agencies are implicated. If so, knowledge—whether actual or not—might be entirely irrelevant. In any event, we are not called upon to reach a decision in that regard in the within appeal.

**19.** Even if we were to consider each of the other contentions of the debtor and guarantors regarding alleged errors in the conduct of the foreclosure sale as substantive defenses which are separate and apart from Maplewood's assertion of conflict of interests, those defenses—which include inadequate advertising, the presence of only one bidder at the sale, and inadequacy of price—also relate to the "underlying transac-

tion" and, thus, constitute personal defenses which cannot succeed against a holder in due course. *Wood,* 758 F.2d at 160.

**20.** Although we conduct our inquiry based upon Virginia law, the same result, as discussed *infra,* would seem to obtain if we were to employ the Model UCC.

**21.** VA. CODE ANN. § 8.3–104 (Michie 1991) (repealed 1993) provides in pertinent part as follows:

(1) Any writing to be a negotiable instrument within this title must
 (a) be signed by the maker or drawer; and
 (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this title; and
 (c) be payable on demand or at a definite time; and
 (d) be payable to order or to bearer.
That section, adopted in 1964, was repealed as of January 1, 1993, and was replaced by VA. CODE ANN. § 8.3A–104 (Michie 1993). However, there would not seem to be any material difference between the two sections. Consequently, we need not, and do not, determine which version applies.

ing prime rate charged by the Chase Manhattan Bank." *Taylor v. Roeder*, 234 Va. 99, 360 S.E.2d 191, 194 (1987). However, Virginia law, amended in 1988, provided that:

> (2) A rate of interest that cannot be ascertained by looking only to the instrument is "a stated rate of interest" in subsection (1) of this section [and thus, a sum certain sufficient to meet the requirements of a negotiable instrument] if the rate is readily ascertainable by a reference in the instrument to a published statute, regulation, rule of court, generally accepted commercial or financial index, compendium of interest rates, or announced or established rate of a named financial institution.

VA. CODE ANN. § 8.3–106(2) (Michie 1991) (repealed 1993).[22] Because the Note issued by Maplewood refers to an "established rate of a named financial institution," *id.*, under the law in effect since 1988, it does contain a sum certain and would be considered a negotiable instrument.[23] *See Marriott v. Harris*, 235 Va. 199, 368 S.E.2d 225, 238 n. 8 (1988) (noting that the aforementioned amendment to § 8.3–106(2), "approved March 16, 1988, and made effective upon passage," permits what *Taylor* prohibited).

In order to decide whether the Note is negotiable under Virginia law, we must determine which version of the statute controls. The 1988 amendment was passed by Act of the Virginia General Assembly on March 16, 1988, and stated "[t]hat an emergency exists and this act is in force from its passage." 1988 Va. Acts ch. 150. The use of that type of emergency language merely serves "to advance the date the emergency measure is to become operative [from the standard date for enforcement of new statutes to the designated date]. Whether the statute was intended to have retrospective effect is a question governed by the rules of statutory con-

struction." *Fletcher v. Tarasidis*, 219 Va. 658, 250 S.E.2d 739, 740 (1979).

An evaluation of which version of the statute appropriately applies to the within case thus requires a consideration of retroactivity. *Cf. Gloucester Realty Corp. v. Guthrie*, 182 Va. 869, 30 S.E.2d 686, 687–88 (1944) (The court analyzed the issues in that case, in which the statute changed between the date that the deed of trust was signed and the date that the foreclosure sale took place, under retroactivity principles, although we note that in that case the deed itself expressly referred to the older statute). Although no default or foreclosure took place until 1991, and the RTC, the potential holder in due course, did not enter the scene until April 1992, the Note was signed before the effective date of the statute. Furthermore, although the entire sequence of events leading to the purchase and assumption by the RTC was not in the ordinary course of business and could not have been readily anticipated at the time the Note was signed, Maplewood may have signed the Note with the expectation that the instrument's non-negotiability would preclude future transferees from claiming holder-in-due-course immunity from personal defenses. Accordingly, there is at least some basis for concluding that Maplewood may have placed some reliance upon the Note's non-negotiability at the time the document was executed.

> Every reasonable doubt is resolved against a retroactive operation of a statute, and words of a statute ought not to have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them or unless the intention of the legislature cannot be otherwise defined, and the lack of such intention is evidenced by its failure to express an intention to make the statute retroactive.

---

**22.** That section was repealed and replaced by VA. CODE ANN. § 8.3A–112 (Michie 1993) as of January 1, 1993. § 8.3A–112 states in pertinent part that "[t]he amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument." For purposes of this appeal, there would not appear to be any material difference between the amended version of § 8.3–106 and § 8.3A–112.

**23.** Under the current version of the Model UCC in effect at present, the Note likewise would be considered negotiable. *See* MODEL UCC § 3–112(b) (1990) ("The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument.").

*Shilling v. Commonwealth,* 4 Va.App. 500, 359 S.E.2d 311, 315 (1987); *see also Harbour Gate Owners' Ass'n, Inc. v. Berg,* 232 Va. 98, 348 S.E.2d 252, 255 (1986) (Remedial legislation may apply retroactively "where the legislative intent to do so is clear.").

■ In examining a statute to ascertain its retroactivity, Virginia courts also have asked whether the right affected by the new legislation is remedial, substantive or vested in nature. *See Shiflet v. Eller,* 228 Va. 115, 319 S.E.2d 750, 753–54 (1984). If the right impinged is "substantive" or "vested," it is "protected from retroactive application of statutes." *Id.* 319 S.E.2d at 753. Statutes dealing with such rights "are not to be construed retrospectively unless plainly so intended." *Guthrie,* 30 S.E.2d at 688; *see also Shilling,* 359 S.E.2d at 314 (quoting 17 Michie's Jurisprudence *Statutes* § 73 (1979)). "[N]ew legislation will ordinarily not be construed to interfere with existing contracts, rights of action, suits, or vested property rights." *Berg,* 348 S.E.2d at 255. Apparently, however, " '[r]emedial statutes which neither create new rights nor take away vested ones are not within the strict application of the rule' " of presumption against retroactivity. *Guthrie,* 30 S.E.2d at 688 (quoting 25 R.C.L. 790). In defining these different types of rights, the Supreme Court of Virginia has commented that "[s]ubstantive rights, which are not necessarily synonymous with vested rights, are included within that part of the law dealing with creation of duties, rights, and obligations, as opposed to procedural or remedial law, which prescribes methods of obtaining redress or enforcement of rights." [24] *Shiflet,* 319 S.E.2d at 754.

Although it is difficult to draw a firm line between "substantive" and "remedial," it appears as if the "right" at issue in the within case, *i.e.,* whether or not the Note should be regarded as negotiable, falls on the substantive side of the boundary. Whether or not the maker of the Note is able to assert personal defenses against subsequent holders initially depends upon whether the Note is negotiable. Moreover, the case law appears to intimate that "contract rights" in themselves are to be considered substantive, regardless of the nature of the particular contract right at issue in a given case. The Supreme Court of Virginia, in the course of discussing the possible application of the somewhat more lenient rule of statutory construction used to decide the retroactivity of remedial statutes, rather summarily stated, "this latter rule [regarding remedial statutes] has no application to the case at bar because here contract rights are involved." *Guthrie,* 30 S.E.2d at 688. Furthermore, § 8.3–106, when amended in 1988, did not use the type of language

> usually employed when the legislature intends an enactment to have a retrospective effect. It was not expressly made applicable to [instruments] "heretofore and hereafter made", as is usual in retrospective statutes. The absence of apt language making the amendment apply to those instruments executed prior to its effective date rather clearly demonstrates that it was not the intent of the legislature that it should apply to such prior instruments.

*Guthrie,* 30 S.E.2d at 688. The facts in *Guthrie* are similar to those at bar, although in that case the earlier version of the statute which later was amended was "expressly referred to, incorporated in and made a part of the deed of trust" at issue. *Id.* at 687. The Supreme Court of Virginia in *Guthrie* viewed the inclusion of that earlier statute as illustrative of the importance placed upon that section by the parties. *Id.* at 688. In the within case, there is no such reference to the statutory provision in the Note. Nevertheless, under Virginia law, the amended § 8.3–106 would appear not to apply retroactively, leaving the Note involved in this case nonnegotiable because of its interest provision.

---

**24.** Vested rights, while apparently not explicitly defined in the case law, seem to be those rights which have become "present interest[s]; mere expectancy of future benefits, or contingent interest in property founded on anticipated continuance of existing laws, does not constitute 'vested right.' " Black's Law Dictionary 1563 (6th ed. 1990). Thus, in this case the interest of Maplewood in having the Note regarded as non-negotiable would not appear to have "vested" at the time of the statutory amendment because no foreclosure of the property or transfer of the Note had yet occurred.

In that regard, it is to be noted that under the Model UCC prior to its amendment in 1990, the Note also would have been non-negotiable for the same reason. 1 Comm. Law & Pract. Guide ¶ 13.03[5], at 13–23 (1993). Furthermore, the 1990 amendment to the Model Code permitting such an interest provision "will not, in fact, be the law governing most negotiable instruments for several years.... [It] will become effective ... only with regard to instruments issued after its effective date." *Id.*, ¶ 13.01 at 13–4.

 In sum, we conclude that the Note executed by Maplewood is not negotiable under Virginia law. Thus, Virginia law would not classify the RTC as a holder in due course. *See* VA. CODE ANN. § 8.3A–302 (Michie 1993) (refers to "instrument" as defined in VA. CODE ANN. §§ 8.3A–103(b) and 8.3A–104(b) (Michie 1993)); *see also* MODEL UCC §§ 3–104(b), 3–302 (1990). "There cannot be a holder in due course of a nonnegotiable instrument.... The holder of a nonnegotiable instrument is not under any circumstances given the peculiar protection afforded ... to a holder in due course of a negotiable instrument." 11 Am.Jur.2d *Bills & Notes* § 377 (1963) (footnote omitted); *see also United States v. Kellerman,* 729 F.2d 281, 284 (4th Cir.1984) (Under Virginia law, "only a holder can be a holder in due course," and "to be a holder, the [instrument] must have been negotiated.").

In addition, another provision of Virginia law in effect in 1987, when the Note came into existence, states:

(3) A holder does not become a holder in due course of an instrument:

(a) by purchase of it at judicial sale or by taking it under legal process; or

(b) by acquiring it in taking over an estate; or

(c) by purchasing it as part of a bulk transaction not in regular course of business of the transferor.

VA. CODE ANN. § 8.3–302(3) (1991) (repealed 1993). Indeed, the Official Comment to that section teaches:

Subsection (3) is intended to state existing case law. It covers a few situations in which the purchaser takes the instrument under unusual circumstances which indicate that he is merely a successor in interest to the prior holder and can acquire no better rights.... The provision applies to a purchaser at an executor's sale, a sale in bankruptcy or a sale by a state bank commissioner of the assets of an insolvent bank. It applies equally to an attaching creditor or any other person who acquires the instrument by legal process.

VA. CODE ANN. § 8.3–302 offic. cmt. 3 (Michie 1991) (repealed 1993).[25] Consequently, because of § 8.3–302, the RTC would not have become a holder in due course when it acquired the Note even if the Note were negotiable, since the RTC acquired the Note pursuant to a purchase and assumption transaction.

The result is that, in this case, if we rely upon Virginia law, the conflicting interests on the part of the officers and/or counsel of the trustee would bar the claims of the RTC because that agency is considered by Virginia statutes and case law to be an ordinary holder of a non-negotiable instrument. Nonetheless, if governing federal principles other than Virginia law were to apply herein, it is arguable that those principles may accord holder-in-due-course status, or the equivalent thereof, to the RTC in this case

---

**25.** § 8.3–302(3) is identical to MODEL UCC § 3–302(3) (1990). Furthermore, the language of the Comment draws directly from the Official Comment to that section in the Model Code. *See* MODEL UCC § 3–302 cmt. 3.

§ 8.3–302 was repealed and replaced by VA. CODE ANN. § 8.3A–302 (Michie 1993) as of January 1, 1993. The new statute makes even more clear that, under Virginia law, the RTC would not be considered a holder in due course. It provides in pertinent part:

(c) Except to the extent a transferor or predecessor in interest has rights as a holder in

due course, a person does not acquire rights of a holder in due course of an instrument taken (i) by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding, (ii) by purchase as part of a bulk transaction not in ordinary course of business of the transferor, or (iii) as the successor in interest to an estate or other organization.

§ 8.3A–302(c). As there does not seem to be any material difference between the new and old sections, we need not, and do not, decide which section applies herein.

and alter this case's outcome in the RTC's favor.

## VII.

 The RTC is a federal agency entrusted with unique responsibilities for supervising and managing many of our nation's thrift institutions.

Although much of the case law dealing with the question of federal common-law holder in due course has involved the FDIC and not the RTC, those courts of appeals which have considered the issue appear uniformly to have decided that "the RTC possesses the same rights and powers as are available to the FDIC." *RTC v. Carr*, 13 F.3d 425 (1st Cir.1993).[26] "[R]ecent precedent confirms that we should apply federal common law to determine the rights and interests of parties to negotiable interests where the FDIC or RTC is a party.'" *Daddona*, 9 F.3d at 318 (quoting *Adams v. Madison Realty & Dev., Inc.*, 937 F.2d 845, 855 (3d Cir.1991)). Although our circuit does not seem to have addressed the issue of equivalence between the two agencies, logic, as well as the language of 12 U.S.C. § 1441a(b)(4)(A) (1993),[27] leads us to concur in that conclusion. In turn, that causes this Court to come to grips with the further question of whether the RTC in this case is a holder in due course. That issue also has not been considered by this circuit, although it has been decided by several other courts of appeals, including the Fifth, Sixth, and Eleventh Circuits.

## VIII.

The Supreme Court in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), employed federal common law to bar as a defense against the FDIC's suit upon a promissory note the invocation of a "secret agreement" which was not recorded in the insured bank's records. *D'Oench, Duhme*, 315 U.S. at 461, 62 S.Ct. at 681. That decision and its progeny erect a judicial shelter for the FDIC against certain "defenses as well as affirmative claims," *Carr*, 13 F.3d 425, and "provid[e] the FDIC with protection as a holder in due course when it acquires a negotiable instrument." *Oaks Apts.*, 966 F.2d at 1001.[28] Such status bars the assertion against the FDIC, or RTC, of "'[p]ersonal' defenses, ... [which] are not truly defenses against the note itself, but rather are defenses or claims stemming from the underlying transaction.... [W]hen the note comes into the hands of an innocent party, a holder in due course, he takes it free of all personal defenses." *Wood*, 758 F.2d at 160.

 Even though federal common law forms the basis of the RTC's rights with regard to the Note, "the more difficult task" which faces this Court in a case such as this "is giving content to this federal rule." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979). Thus, this Court, because it possesses jurisdiction to apply in this case a federal common-law rule, must consider, as a matter of discretion and judicial prudence, whether or not to adopt the relevant Virginia

**26.** *See also RTC v. Daddona*, 9 F.3d 312, 318 (3d Cir.1993); *Jones v. RTC*, 7 F.3d 1006, 1016 n. 21 (11th Cir.1993); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1510 n. 1 (D.C.Cir.1993); *RTC v. Midwest Fed. Sav. Bank*, 4 F.3d 1490, 1494 (9th Cir.1993); *Lester v. RTC*, 994 F.2d 1247, 1252 n. 7 (7th Cir.1993); *RTC v. Oaks Apts. Joint Venture*, 966 F.2d 995, 1001 (5th Cir.1992); *Colorado ex rel. Colorado State Banking Bd. v. RTC*, 926 F.2d 931, 934 (10th Cir.1991).

**27.** § 1441a(b)(4)(A) provides in pertinent part:

[T]he Corporation [RTC] shall have the same powers and rights to carry out its duties with respect to [insured thrifts] as the Federal Deposit Insurance Corporation has under [12

U.S.C. §§ 1821, 1822, and 1823] with respect to insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act) [12 U.S.C. § 1813].

**28.** Although *D'Oench* itself did not invest the FDIC with the status of holder in due course, it asserted and applied federal common law to protect the agency against a defense which would have prevailed against an ordinary holder. *See D'Oench*, 315 U.S. at 455–56, 62 S.Ct. at 678–79. Subsequent opinions of circuit courts, also utilizing federal common-law principles and frequently building upon *D'Oench*'s teaching, have labeled the FDIC and/or the RTC the equivalents of holders in due course. *See, e.g., Wood*, 758 F.2d at 159; *FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1516–18 (11th Cir.1984).

state law rule as the federal rule of decision. The three factors utilized in reaching such a conclusion include whether "federal programs" are involved which " 'by their nature are and must be uniform in character throughout the Nation' ... [thereby requiring] a nationally uniform body of law," *id.* at 728, 99 S.Ct. at 1458 (quoting *United States v. Yazell*, 382 U.S. 341, 354, 86 S.Ct. 500, 507–08, 15 L.Ed.2d 404 (1966)), whether the state law might "frustrate specific objectives of the federal programs," *id.*, and whether and to what "extent ... application of a federal rule would disrupt commercial relationships predicated on state law." *Id.* at 729, 99 S.Ct. at 1549.[29]

Despite the cautionary language of *Kimbell Foods*, several courts which have grappled with issues in some respects similar to those facing us here have reached results which differed from those called for by the applicable state-law rule. *See, e.g., FDIC v. Blue Rock Shopping Center, Inc.*, 766 F.2d 744, 746–47 (3d Cir.1985); *Wood*, 758 F.2d at 158–60; *Gulf Life*, 737 F.2d at 1518. In those cases, in the view of those courts, the applicable state rule would have frustrated, or at least threatened to frustrate, the federal agency's claim. *See, e.g., Blue Rock*, 766 F.2d at 746–47; *Wood*, 758 F.2d at 160; *Gulf Life*, 737 F.2d at 1518. Similarly, 12 U.S.C.A. § 1823(e) (West 1989)[30] eliminates extraneous defenses which are not evident from the records of the bank or the face of the instrument and which might thwart the federal agency's claim if given effect pursuant to state law. Of course, in this case we are not confronted with an "agreement" as such and, thus, are not directly within the purview of the statute.

The first two *Kimbell Foods* factors—the need for uniformity and the degree to which state law may frustrate the attainment of specific federal objectives—arguably point herein to the need for a federal common-law rule which produces a different result from that provided by Virginia law. The RTC, like the FDIC, engages in purchase and assumption transactions involving failed thrifts in virtually every state in our nation. Different states inevitably will possess varying requirements for a party to become a holder in due course. If that party cannot satisfy those requirements, it becomes subject to a whole host of defenses, stemming from problems not apparent on the face of a note, to that note's enforcement.

That latter fact is not unimportant in the light of the notion that "[t]he most striking advantage of a purchase and assumption transaction over the alternative, liquidating the bank's assets and paying the depositors their insurance, is its speed." *Wood*, 758 F.2d at 160. Also, "national uniformity is important to permit the FDIC to promote the stability of and confidence in our nation's

**29.** In *Kimbell Foods*, the issue was "whether contractual liens arising from certain federal loan programs take precedence over private liens, in the absence of a federal statute setting priorities." *Id.* 440 U.S. at 718, 99 S.Ct. at 1453. The Supreme Court "conclude[d] that the source of law is federal, but that a national rule is unnecessary to protect the federal interests underlying the loan programs. Accordingly, we adopt state law as the appropriate federal rule for *establishing the relative priority of these competing federal and private liens.*" *Id.* In that same spirit, at least one federal district court has retained a state rule where it "provides a convenient resolution not inconsistent with adequate protection of the federal interests involved," or, in other words, where it would not forestall the federal agency from *successfully asserting its* claim. *FDIC v. Percival*, 752 F.Supp. 313, 323 (D.Neb.1990). However, the above case law must presently be read in the light of the Supreme Court's recent decision in *O'Melveny &*

*Myers v. FDIC*, —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (discussed *infra* ).

**30.** § 1823(e) provides:
No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) has been, continuously, from the time of its execution, an official record of the depository institution.

banking system." *Blue Rock*, 766 F.2d at 748.

## IX.

All of the circuits which have spoken on the subject have invested the FDIC or the RTC with the protections of holders in due course under a federal common-law rule of decision when those agencies have acquired instruments deemed negotiable under state law as part of purchase and assumption transactions, regardless of what the otherwise applicable state rule would dictate.[31] *See, e.g., Blue Rock*, 766 F.2d at 746–47; *Wood*, 758 F.2d at 161. However, as noted earlier, the Note herein is not negotiable under applicable Virginia law. In that context, there exists a split within our companion circuits regarding whether to resort to state law, which generally forbids holder-in-due-course status to a holder of a non-negotiable instrument, or to create a federal rule granting such status to federal agencies such as the RTC or the FDIC. *Compare* *FDIC v. Payne*, 973 F.2d 403, 404 (5th Cir. 1992) and *Montross*, 923 F.2d at 356 (declining to extend holder-in-due-course protections in the context of non-negotiable instruments) *with Gulf Life*, 737 F.2d at 1518 (granting the FDIC the immunities of a holder in due course with regard to a non-negotiable instrument).[32]

In this case, the fact that Virginia and several other states,[33] as well as the drafters of the Model UCC,[34] have amended their statutes in recent years to render negotiable an instrument with the type of interest provision present in the Note in this case illustrates an emerging consensus in the state legislatures and among legal scholars as to the wisdom of such a change. At least one commentator has remarked upon the "problems … created for the financial industry" by case law determining instruments with this type of provision to be non-negotiable. *See* 1 Comm. Law & Pract. Guide (MB) ¶ 13.03[5], at 13–23.

---

**31.** As discussed in Part V, *supra*, the fact that the defense in this case which is asserted by Maplewood arises out of the foreclosure sale, and not in connection with the Note itself, would not appear to be controlling. In fact, several courts, in dealing with the FDIC or RTC, specifically have applied *D'Oench* or its progeny and have clothed those agencies with the immunities of a holder in due course in situations involving personal defenses similar to the conflict-of-interests defense asserted here. For example, the Fifth Circuit, in *Sunbelt Sav., FSB v. Montross*, 923 F.2d 353, 355 (5th Cir.1991), *reh'g granted en banc on other grounds*, 932 F.2d 363, *reinstated in part, remanded, RTC v. Montross*, 944 F.2d 227 (5th Cir.1991), applied a federal common-law analysis in a situation nearly identical to that present in the within case. In *Montross*, the thrift at issue, before failing, foreclosed upon property which had been posted to secure a promissory note upon which the debtor had defaulted, purchased the property at the foreclosure sale, and filed suit against the debtor for the deficiency. *Id.* at 354. The debtor's defenses were that, before failing, the thrift had wrongfully "prevented [the debtor] from transferring the note to a new debtor as allowed by the deed of trust," and "as an affirmative defense, he satisfied the conditions in the deed of trust, thus, absolving him of personal liability for the note." *Id.* Despite the fact that the debtor's sole defenses revolved around the deed of trust and not the note itself, the court in that case engaged in an extensive discussion of the applicability of federal common-law holder in due course before ultimately ruling that holder-in-due-course protec- tion was not available to the federal agency because of the non-negotiability of the variable interest promissory note. *Id.* at 355–57; *see also, e.g., Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244, 1249 (5th Cir.1990) (specifically discussing *D'Oench* and extending to the FDIC the immunities of a holder in due course in the context of defenses alleging improprieties in the seizure and sale of collateral); *Blue Rock*, 766 F.2d at 746 (reaching the same conclusion in connection with a defense asserting unjustifiable impairment of collateral); *RTC v. Parnell*, No. 92–562–A, slip op. at 7 (E.D.Va. Aug. 18, 1992) (according RTC holder-in-due-course protections against a defense of "lack of good faith associated with the foreclosure sale" by the defunct thrift).

**32.** The Sixth Circuit's position in that regard seems uncertain. *Compare FDIC v. Morrison*, 816 F.2d 679, 1987 WL 37065 (6th Cir.1987) (table) (text in Westlaw) (extending holder-in-due-course protection) *with FDIC v. Aetna Cas. & Surety Co.*, 947 F.2d 196, 205 n. 8 (6th Cir.1991) (in *dictum*, citing with approval the Fifth Circuit's decision in *Montross*).

**33.** *See, e.g.*, MD.COM.LAW CODE ANN. § 3–106 (1992) (amended 1990); N.Y.U.C.C. LAW § 3–106 (Consol.1991) (amended 1988); *see also* 1 Comm. Law & Pract. Guide (MB) ¶ 13.03[5], at 13–23 (mentioning that "a number of states" have so amended their statutes).

**34.** *See* Part VI, *supra*.

Additionally, commercial transactions of the type which took place between Maplewood and Commonwealth commonly involve negotiable notes. *Cf. Gulf Life,* 737 F.2d at 1518. The Note at issue in this case would be considered negotiable under most states' statutes today, including that of Virginia; the only reason why it is not so considered by this Court in this appeal is because of the non-retroactivity of the now-amended version of Virginia law dealing with permissible interest-rate provisions.

However, those considerations must be evaluated in the light of the Supreme Court's recent decision in *O'Melveny & Myers v. FDIC,* — U.S. —, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). In that decision, Justice Scalia stated that

> [t]he issue in this case is whether, in a suit by the Federal Deposit Insurance Corporation as receiver of a federally insured bank, it is a federal-law or rather a state-law rule of decision that governs the tort liability of attorneys who provided services to the bank.
>
> . . . .
>
> [The FDIC contends that] (1) a federal common-law rule and not California law determines whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation; and (2) even if California law determines the former question, federal common law determines the more narrow question whether knowledge by officers so acting will be imputed to the FDIC when it sues as receiver of the corporation.

*O'Melveny,* — U.S. at — – —, 114 S.Ct. at 2051–52.

As to the first of those contentions, Justice Scalia concluded that it

> need not detain us long, as it is so plainly wrong. "There is no federal general common law," *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), and . . . the remote possibility that corporations may go into federal receivership is no conceivable basis for adopting a special federal common-law rule

divesting States of authority over the entire law of imputation.

*Id.* at — – —, 114 S.Ct. at 2052–53.

Justice Scalia characterized the second contention of the FDIC in *O'Melveny* as an assertion of "federal pre-emption not over the law of imputation generally but only over its application to the FDIC suing as receiver" and noted the reliance by the FDIC upon *Kimbell Foods.* *Id.* at —, 114 S.Ct. at 2053. Rejecting that approach, the Justice wrote:

> But the FDIC is not the United States . . . [and][,] [i]n any event, knowing whether "federal law governs" in the *Kimbell Foods* sense—a sense which includes federal adoption of state law-rules, *see [Kimbell Foods,* 440 U.S. at 727–729, 99 S.Ct. at 1457–59]—does not much advance the ball. The issue in the present case is whether the California rule of decision is to be applied to the issue of imputation or displaced, and if it is applied it is of only theoretical interest whether the basis for that application is California's own sovereign power or federal adoption of California's disposition.

*Id.* at — – —, 114 S.Ct. at 2053–54.

In conclusion, in *O'Melveny,* Justice Scalia asserted:

> What is fatal to respondent's position in the present case is that it has identified no significant conflict with an identifiable federal policy or interest. There is not even at stake that most generic (and lightly invoked) of alleged federal interests, the interest in uniformity. The rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of private actors that has already occurred. Uniformity of law might facilitate the FDIC's nationwide litigation of these suits, eliminating state-by-state research and reducing uncertainty—but if the avoidance of those ordinary consequences qualified as an identifiable federal interest, we would be awash in "federal common-law" rules.
>
> . . . .

We conclude that this is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted.

*Id.* at —— — ——, 114 S.Ct. at 2055–56.

In the light of *O'Melveny,* there is a heavy presumption in favor of application of a rule of decision in accordance with Virginia law as opposed to the creation of a federal rule of decision. *See id.* at ——, 114 S.Ct. at 2055 (commenting that "there is no federal policy that the [FDIC] fund should always win"). Further, any perceived need for uniformity— "that most generic (and lightly invoked) of alleged federal interests"—is inadequate to disturb that presumption. *Id.,* at ——, 114 S.Ct. at 2055. Although if we were to create a federal common-law rule of decision in this case we would be acting in conformity with present Virginia law, nevertheless such an action would disregard that state's retroactivity principles and, to that extent, "disrupt commercial relationships predicated on state law" and engaged in by individuals in reliance upon that law. *Kimbell Foods,* 440 U.S. at 729, 99 S.Ct. at 1459. In sum, this case just "is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." *O'Melveny,* —— U.S. at ——, 114 S.Ct. at 2056.

Virginia law would not accord the RTC the immunities of a holder in due course in this case because, under the operative Virginia statute, the Note is non-negotiable. For that reason, we conclude that Maplewood may validly assert herein the conflict-of-interests defense and thus, in turn, bar the RTC from asserting its claim, resulting in judgment in favor of Maplewood. Accordingly, we reverse the judgment of the district court and remand this case to the district court to enter a judgment in favor of Maplewood.

*REVERSED AND REMANDED.*

NIEMEYER, Circuit Judge, dissenting:

I would affirm the judgment of the district court for the reasons articulated by that court, and accordingly, I respectfully dissent.