RESOLUTION TRUST CORPORATION, in its Capacity as Receiver for Home Federal Savings Bank of Worcester, Plaintiff, Appellee,

v.

Michael F. CARR, Defendant, Appellant.

No. 93–1418.

United States Court of Appeals, First Circuit.

Heard Oct. 4, 1993.

Decided Dec. 22, 1993.

Mark S. Furman with whom Edward R. Wiest and Tarlow, Breed, Hart, Murphy & Rodgers, P.C., Boston, MA, were on brief for defendant, appellant.

Thomas Paul Gorman with whom Sherin & Lodgen, Boston, MA, was on brief for plaintiff, appellee.

Before BREYER, Chief Judge, ROSENN,* Senior Circuit Judge, and CYR, Circuit Judge.

\* Of the Third Circuit, sitting by designation.

ROSENN, Senior Circuit Judge.

This appeal has its genesis in the real estate recession which first struck New England and many other parts of the country several years ago. The malaise apparently not only adversely affected the appellant, Michael F. Carr, a real estate developer, but also the Home Federal Savings Bank (the Bank) from whom he borrowed a substantial sum of money. The Bank foreclosed on an unimproved ocean lot Carr mortgaged to it. Ultimately, the Bank also failed. The Resolution Trust Corporation (RTC/Receiver) became its Receiver.

The RTC succeeded the Bank as plaintiff in an action brought by the Bank, a federally chartered savings association organized under the laws of the United States, in the Worcester Superior Court of Massachusetts against Carr. The Bank sued to recover a deficiency on a promissory note executed by Carr as evidence of a loan from the Bank in 1988 for $243,000, secured with a first mortgage on property located in Marshfield, Massachusetts. While this litigation was in process, Carr filed a complaint in the state court for Middlesex County, Massachusetts, alleging wrongful foreclosure on the property securing the note. The court consolidated the actions.

The RTC/Receiver removed the cases to the United States District Court for the District of Massachusetts and then moved for summary judgment. The district court granted the motion by order dated March 29, 1993.[1] Carr timely appealed to this court. We affirm.

I.

Carr obtained a first mortgage loan from the Bank on his property at 45 Old Beach Road, Marshfield, Massachusetts, on August 16, 1988. Shortly before the maturity of the note on September 1, 1989, Carr requested of the Bank a one year extension. The Bank's Executive Committee approved the extension subject to a number of conditions, including

1. The district court had subject matter jurisdiction under 12 U.S.C. § 1441a(a)(11) while we have jurisdiction pursuant to 28 U.S.C. § 1291.

the payment by Carr of a one percent extension fee in the amount of $2,430.

The Bank notified Carr of the proposed extension and its conditions by letter dated September 13, 1989. The letter provided that the commitment to extend "shall expire on October 16, 1989, and that a modification agreement must be executed on or before such date." The letter also required that the commitment be accepted and returned no later than September 22, 1989, together with Carr's check for $2,430. Accordingly, Carr affixed his · signature in acceptance of the letter on September 20, 1989, and tendered the required check. · The check, however, was returned for insufficient funds. Thereafter, Carr neither paid the extension fee nor executed the required modification agreement. The minutes of the Executive Committee approving the extension of the loan and fixing the extension fee made no mention of a date for the payment of the extension fee or any details pertaining to the implementation of the extension.

In response to the RTC's interrogatories, Carr testified that he advised the Bank's counsel in late September or early October 1989 that he had another loan with the Bank for $1,500,000 which he expected to refinance at the end of October, and that counsel agreed that payment of the extension fee could be deferred until the refinancing of his other loan. He further testified that sometime after October 24, 1989, he spoke to Paul Engstrom, Jr., a senior loan counselor of the Bank, he advised Engstrom of the upcoming closing on the $1,500,000 loan, and Engstrom orally agreed to defer payment due under the extension until that closing.

On October 24, 1989, the Bank informed Carr that his extension fee, as well as his monthly payment checks on the note, had been returned for insufficient funds. The Bank demanded payment of the total arrearage and the extension fee by October 30, but as of November 16, 1989, Carr had not responded. On November 17, 1989, payment not having been made, the Bank made formal demand under the defaulted promissory note. Negotiations between Carr and the Bank again ensued but they reached no agreement. The Bank commenced foreclosure proceedings and ultimately purchased the mortgaged land in April 1990 at the foreclosure sale for $195,000.

In his action in the Middlesex Court, Carr asserted that the Bank actually had agreed to extend the due date of the note for one year, from September 1, 1989, to September 1, 1990, but the terms were changed in the preparation of the extension draft. Carr further claimed that the September 1989 minutes of the Bank reflected an appraisal of the Marshfield property at $325,000 and that Carr's appraiser subsequently valued it at $350,000. Carr therefore sought relief because of a wrongful foreclosure in the face of an agreement to extend the note to September 1, 1990, unjust enrichment to the Bank, breach of covenant of good faith and fair dealing, and failure to conduct the foreclosure sale in a commercially reasonable manner. He also sought reconveyance of the property. In addition, he filed a counterclaim in the consolidated actions in the Worcester Court substantially identical to his complaint in the Middlesex Court.

The district court, after the RTC removed the case to federal court, granted the RTC's motion for summary judgment in the consolidated matters based on the undisputed record, including a Statement of Undisputed Facts, affidavits, and other supporting documentation filed by the RTC.

II.

The principal issues raised on appeal by Carr are: (1) The Bank agreed to extend the maturity date of the $243,000 note. (2) The gap between the appraised value of the mortgaged property and the price obtained at foreclosure sale barred summary judgment against him for the deficiency because there were genuine issues of material fact whether the foreclosure sale was conducted in good faith and in a commercially reasonable manner.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may only be entered "if there is no genuine issue as to any material fact." In reviewing a summary judgment order entered by a district court, this court has plenary powers. *See, e.g.,*

*Garside v. Osco Drug, Inc.,* 976 F.2d 77, 78 (1st Cir.1992); *Olivera v. Nestle Puerto Rico, Inc.,* 922 F.2d 43, 45 (1st Cir.1990). The court, in making its review, must "look at the record in the light most favorable to the party opposing summary judgment and accept all reasonable inferences favorable to such party arising from the record." *Id.* at 45 (citations omitted).

### III.

■ Carr first argues that the minutes of the Executive Committee did not refer to a date for closing or for payment of the extension fee and that the deadlines in the commitment letter "were not conditions of the loan extension approved in the Executive Committee minutes." Therefore, he asserts that in light of the difference between the minutes and the language of the extension commitment, and his affidavit that the Bank officers had orally agreed to defer payment of the extension fee until the closing of the refinancing of the $1,500,000 loan, summary judgment was inappropriate. This argument is disingenuous and has no merit whatsoever.

The Executive Committee records reveal an approval of a request for a one year extension of the loan subject to a number of conditions. Among the conditions for the extension were the requirements that an extension fee be paid and that the loan be kept current.

Understandably, the Executive Committee did not spell out the mechanics and language of the extension agreement, for such administrative details ordinarily are left to bank officers. In this instance, the officers unequivocally provided for the payment of the extension fee of $2,430 "upon acceptance of this commitment." Carr made no objection to the terms and conditions of the commitment and signed his acceptance of it a week after the Executive Committee had approved the extension. He then tendered his check in payment of the fee. Thus, even Carr recognized by his execution of the letter of commitment that it, and not the minutes, constituted his agreement with the Bank. His check, however, was returned for insufficient funds and he never paid this fee. The commitment also required, in accordance with the recommendation to the Executive Committee, that Carr bring his loan current and supply the Bank with additional updated financial information. Additionally, the commitment letter stated other details with respect to closing costs and expenses and title examination. Carr agreed to its terms but never fulfilled any of the extension requirements after accepting them, including the execution of the required modification agreement.

Carr reaches for a straw when he attempts to carve out a contract from the corporation minutes. The minute book of a corporation is only a brief record of the corporate proceedings. 5A William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 2190 (Perm. ed. rev. vol. 1987). Here, it is merely an internal record which memorializes authority to the Bank's officers to grant an extension of Carr's loan. The minutes, which of course were never "executed" by Carr, *see* 12 U.S.C. § 1823(e)(2) (1989), *infra,* do not purport to be an agreement with him. They in no way reflect any intention on the part of the Executive Committee to defer payment of the extension fee until the refinancing of the $1,500,000 loan.

■ Similarly, Carr's reliance on an alleged oral supplemental agreement with a bank officer is misplaced. In *D'Oench, Duhme and Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court first enunciated the common law doctrine that the FDIC is protected from unrecorded or oral agreements that are not reflected in one of its insured bank's records. *Id.* at 461, 62 S.Ct. at 681. The *D'Oench* doctrine bars defenses as well as affirmative claims against the FDIC. *Timberland Design Inc. v. First Service Bank for Sav.,* 932 F.2d 46, 50 (1st Cir.1991). Pursuant to 12 U.S.C. § 1441a(b), which establishes the RTC, and 12 U.S.C. § 1441a(b)(4), the RTC possesses the same rights and powers as are available to the FDIC. Moreover, 12 U.S.C. § 1823(e), as amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), which codifies the *D'Oench* doctrine, also requires all agreements to be reflected in a bank's records.

The section provides that:

[N]o agreement which tends to diminish or defeat the interest of the [Receiver] in any asset acquired by it under this section or section 1821 ... shall be valid against the [Receiver] unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e) (1989). This section requires categorical compliance. *Beighley v. FDIC,* 868 F.2d 776, 783 (5th Cir.1989).

■ Carr's claim that the officers of the Bank had orally agreed not to require payment of the extension upon Carr's acceptance of the extension commitment, but to defer it until the refinancing of his large loan, constitutes the very kind of an assertion that the *D'Oench* doctrine and 12 U.S.C. § 1823(e) proscribe. *See Langley v. FDIC,* 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987). Inasmuch as the record fails to establish that Carr entered into any agreement, except the unfulfilled extension commitment, which in any way complied with federal statutory or common law, his claims are barred.

### IV.

The second arrow in Carr's quiver is aimed at the Bank's conduct in connection with the foreclosure sale of the Marshfield property. Carr claims that the gap between the appraised value of this property and the price obtained at the foreclosure sale raises serious questions of material fact as to whether the sale was conducted in good faith and in a commercially reasonable manner. Under such circumstances, Carr asserts that the district court should not have granted summary judgment. The district court found that "Carr cannot, and has not, complained that there were procedural or notice defects in the foreclosure." Carr's sole complaint on appeal is that the price obtained was inadequate. He therefore argues in a general way that a genuine issue of material fact exists as to "the commercial reasonableness and good faith employed in the foreclosure sale."

Carr neither alleges nor has he proven that he did not receive adequate notice of the sale or that there was insufficient public notice of the forthcoming sale in the press or that the Bank acted collusively, or did anything to depress the price prior to or at the sale. In short, he does not claim that the foreclosure sale was conducted in violation of any applicable law. Rather, he relies entirely on the affidavit of a real estate appraiser whom he commissioned, who placed the fair market value of the property at $350,000 on January 11, 1990, approximately four months before the sale. Carr's counsel sent the appraisal to the Bank. Carr also points to the Bank minutes of September 6, 1989, which reflected an appraisal value of $325,000 for the property. However, on March 29, 1990, an appraisal conducted for the Bank a few days before the foreclosure showed a value of $195,000.

■ The threshold question is what law governs this issue—state or federal law. Neither the *D'Oench* doctrine nor § 1823(e) bars the assertion of a claim or defense that does not depend on an agreement; they protect federal banks and the RTC from alleged oral agreements that are not part of the loan record. *Texas Refrigeration Supply Inc. v. FDIC,* 953 F.2d 975, 981 (5th Cir.1992). This second issue only pertains to the propriety of the foreclosure sale in the state court. We believe that state law governs this issue because the Bank foreclosed the property under state court proceedings. The property was not involved in any federal bankruptcy proceedings. *See id.* at 982 (applying state law to wrongful foreclosure claim). The district court relied on state law, as does Carr, and so do we.

■ Under Massachusetts state law, Carr has the burden of proving commercial unreasonableness, *Chartrand v. Newton*

**430**

*Trust Co.,* 296 Mass. 317, 320, 5 N.E.2d 421, 423 (1936), which is a question of fact, *John Deere Leasing Co. v. Fraker,* 395 N.W.2d 885, 887 (Iowa 1986). Absent evidence of bad faith or improper conduct, a mortgagee is permitted to buy the collateral at a foreclosure sale as "cheaply" as it can, *Cambridge Sav. Bank v. Cronin,* 289 Mass. 379, 383, 194 N.E. 289, 290 (1936), and "[m]ere inadequacy of price will not invalidate a sale unless it is *so gross* as to indicate bad faith or lack of reasonable diligence," *Chartrand,* 296 Mass. at 320, 5 N.E.2d at 423 (emphasis added). Carr alleges that the Bank paid only 56 percent of the property's fair market value ($350,000), but produced no other evidence of bad faith or improper conduct.

To warrant summary judgment for RTC, therefore, it would have to be shown that no reasonable factfinder, crediting Carr's appraisal of $350,000, could find the $195,000 sales price "grossly" inadequate. In canvassing Massachusetts case law, we find ample suggestion that a price deficiency of as much as 39 percent of fair market value can support the granting of a dispositive motion. *See Sher v. South Shore Nat'l Bank,* 360 Mass. 400, 402, 274 N.E.2d 792 (1971) (disparity between price of $35,500 and alleged fair market value of $52,500, *i.e.* a 67 percent sale, was "not so gross" as to withstand a motion to dismiss); *Atlas Mortgage Co. v. Tebaldi,* 304 Mass. 554, 558, 24 N.E.2d 554 (1939) (disparity between price of $13,000 and alleged fair market value of $18,000, *i.e.* 72 percent sale, not "so great" as to defeat a directed verdict for mortgagee); *DesLauries v. Shea,* 300 Mass. 30, 34–35, 13 N.E.2d 932 (1938) (disparity between price of $16,815 and fair market value of $25,500, *i.e.* 65 percent sale, permitted directed verdict for Bank); *Cambridge Sav. Bank,* 289 Mass. at 383, 194 N.E. at 291 (disparity between price of $20,000 and alleged fair market value of $51,000, *i.e.* 39 percent sale, warrants directed verdict). Thus, whatever the hypothetical boundaries of "gross inadequacy" under Massachusetts law, Carr's 56 percent differential, standing alone, could not ward off summary judgment.

■ As to Carr's contention of lack of good faith, the record shows no evidence of it on the part of the Bank and Carr points to none. Carr knew for many months before the sale that foreclosure was imminent. Payment of his note was due September 1, 1989. On August 22, 1989, he wrote to the Bank requesting an extension of one year. The Bank obliged subject to certain conditions which were acceptable to Carr. Thereafter, negotiations between the parties ensued for several months which were inconclusive, and the conditions of the proposed extension were never fulfilled by Carr. The Bank did not commence foreclosure until November 30, 1989, and it was not concluded until the sale on April 5, 1990. Carr had all this time to either pay the note, refinance elsewhere, or especially as an experienced businessman and real estate developer, produce a buyer who would pay the price he aspired to achieve.

On the other hand, the Bank had non-performing real estate on hand which required disposition. As a pragmatic matter, a bank with non-performing assets may not hold them indefinitely until it canvasses an amorphous public market in search of potential purchasers who will pay a theoretical fair market value, lest they too succumb to claims of creditors. Here, the Bank gave Carr every reasonable opportunity to meet his obligation or produce a buyer. He did neither of these.

■ It is common knowledge in the real world that the potential price to be realized from the sale of real estate, particularly in a recessionary period, usually is considerably lower when sold "under the hammer" than the price obtainable when it is sold by an owner not under distress and who is able to sell at his convenience and to wait until a purchaser reaches his price. Carr has not met his burden of proof of showing bad faith. Under Massachusetts law, inadequacy of the selling price "without more, would not show bad faith or lack of diligence." *West Roxbury Co-op Bank v. Bowser,* 324 Mass. 489, 493, 87 N.E.2d 113, 115 (1949).

■ The district court also rejected Carr's claim of a fiduciary duty owed to him, finding that "[t]he relationship here is clearly creditor and borrower." We agree.

Carr also turns to two cases decided under the Federal Bankruptcy Code (Code), 11 U.S.C. § 548 (1988), to support his contention that the sale was commercially unreasonable and in bad faith. He argues that under the Code the foreclosure sale constituted a fraudulent transfer because the price obtained fell below the fair market value. He cites *In re General Industries, Inc.,* 79 B.R. 124, 134 (Bankr.D.Mass.1987), and *In re Ruebeck,* 55 B.R. 163, 171 (Bankr.D.Mass. 1985). These cases arise in the context of federal bankruptcy proceedings where the debtor is in bankruptcy and the official creditors committee sought to set aside the foreclosure sales contending that they were fraudulent transfers under § 548(a) of the Code because the sales were made for less than reasonably equivalent value within the meaning of the statute. The bankruptcy courts held that legal notice of the foreclosure sale without other substantial advertising of the proposed sale in the general press was insufficient to withstand the fraudulent conveyance strictures of the Code. *General Industries,* 79 B.R. at 134; *Ruebeck,* 55 B.R. at 168. In addition, the courts held that sales at 53 percent and 57.7 percent of fair market value were not reasonably equivalent value within the meaning of § 548. *General Industries,* 79 B.R. at 134; *Ruebeck,* 55 B.R. at 171.

Carr, however, is not a debtor within the meaning of the Code and the cases he cites are therefore inapplicable in the context of this case. Moreover, under the facts and conflicting evidence of this case, we cannot say that Carr has proven a fraudulent transfer of property merely because the price obtained at a fairly conducted, non-collusive public foreclosure sale in accordance with applicable state law did not meet his expectations of the value fixed by his appraiser. We need not decide whether advertising of a foreclosure sale in the general press is essential for a good faith sale in Massachusetts because notice of the sale is not an issue before us. We also believe it significant that the decisions of the Bankruptcy Court in *General Industries* and *Ruebeck* were ignored by the Massachusetts legislature when it amended the State's fraudulent conveyance statute in 1989. The statute now provides that

[F]air consideration is given for property or obligation—

(c) When property is received pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of such property upon default under a mortgage, deed or trust or security agreement.

Mass.Gen.Laws Ann. ch. 109A, § 3 (West 1992).

Thus, the Massachusetts legislature did not adopt the principles set forth in *General Industries* or in *Ruebeck.* We see no error in the application of Massachusetts law by the district court and in entering judgment in the RTC's favor.

## V.

In summary, we hold that the minutes of a bank's executive committee, which merely record the authorization of the Board to the bank's officers to extend a loan on certain conditions, do not constitute a contract between a bank and the borrower. Furthermore, alleged oral assurances of federally chartered bank officers to defer compliance with the conditions attached to a proposed extension of a bank loan are barred by federal common law under *D'Oench* and by Congressional statute, 12 U.S.C. § 1823(e). Finally, under Massachusetts law, mere inadequacy of the sale price of real estate received at a non-collusive foreclosure sale conducted in full compliance with state law does not constitute a breach of the covenant of good faith and fair dealing and is not an indication that the sale was commercially unreasonable.

The judgment of the district court is

*Affirmed.* Costs taxed in favor of appellee.