Botsford, J.
The plaintiff, Francis D. Burke (“Burke”), brings the first of these consolidated actions (No. 98-4842) to set aside the foreclosure sales of two condominium properties located at 448 and 452 Broadway in Cambridge, Massachusetts (sometimes collectively referred to as “the properties”). The defendant SunAmerica, Inc. (“SunAmerica”) through its servicing agent, the defendant J. E. Robert Company, Inc. (“JER”), conducted the foreclosure sales. Burke claims that the sales of the properties must be set aside because he did not receive the statutorily re *528 quired notice and because the sales were conducted in a commercially unreasonable manner. SunAmerica moves for summary judgment on Burke’s claims.
Marc Lindenbaum (“Lindenbaum”) was the successful bidder on the property located at 448 Broadway, and Florindo DiCarlo (“DiCarlo") was the successful bidder on the property at 452 Broadway. After Burke filed his complaint against SunAmerica to set aside the two foreclosure sales and recorded a memorandum of lis pendens on each property, Lindenbaum intervened as a defendant and cross-claimant in Burke’s action, and DiCarlo filed a separate suit against Burke and SunAmerica (No. 98-55 14). The two actions were later consolidated. Lindenbaum and DiCarlo each raise claims of (1) intentional interference with contractual relations against Burke; (2) breach of the implied covenant of good faith and fair dealing against SunAmerica; (3) violation of G.L.c. 93A against SunAmerica; and (4) specific performance against SunAmerica. SunA-merica moves for summary judgment as to these claims. Lindenbaum has moved for partial summary judgment as to liability against Burke and also against SunAmerica. DiCarlo has moved for partial summary judgment against Burke.
For the reasons set forth below, SunAmerica’s motion for summary judgment as to the claims filed by Burke will be allowed. SunAmerica’s motion for summary judgment as to the claims filed by Lindenbaum and DiCarlo will also be allowed. Lindenbaum’s and DiCarlo’s motions for partial summary judgment on their claims against Burke will be denied, and Lindenbaum’s motion for partial summary judgment against SunAmerica will be denied.
BACKGROUND
The summary judgment papers reveal the following facts.[6]
On or about December 2, 1988, Burke, as trustee of 448 Broadway Court Realty Trust and as trustee of 452 Broadway Court Realty Trust, purchased two properties in Cambridge, Massachusetts, which are known as and numbered Condominium Unit 448 and Condominium Unit 452 in the Broadway Court Condominiums.[7] On that same day and in connection with the purchases, Burke, individually and as trustee, executed two commercial promissory notes, each in the amount of $262,500, as well as a mortgage security agreement (“mortgage agreement”) for each property. Each note provided for payment to begin on the first day of January 1989,[8] and to continue on the first day of each successive month until the maturity date, November 30, 1990, at which time the principal and all interest accrued would be due. Burke individually pledged approximately$150,000 ofhis own funds held in certificates of deposit (CDs) as additional security for the loans.
Burke did not pay off either of the notes in 1990. In 1991, Burke’s lender, the Boston Trade Bank, failed and the bank was taken over by the Federal Deposit Insurance Corporation (FDIC). The loans were delinquent in 1992; in fact, Burke made no further payments on the loans after July 1, 1992. In approximately May of 1993, the FDIC applied Burke’s CD funds against the debt.
In November of 1997, SunAmerica purchased the notes and mortgages relating to the properties from the FDIC, and hired JER to act as the servicing agent for the loans. At the time SunAmerica purchased the notes and mortgages, Burke was not making payments.
The mortgage agreement for each property con-tamed a notice provision stating that notice would always be sufficient if sent to Burke’s business address at Vesper Properties, One Post Office Square, Boston, Massachusetts, and that a copy of any notice to the mortgagor was to be sent to Burke’s attorney, David Johnson, Esquire of Gadsby & Hannah, One Post Office Square, Boston, Massachusetts.[9] When SunAmerica took over the loans in late 1997, neither it nor JER communicated with Burke exclusively or even regularly at his business address, and did not send copies of any correspondence to the attorney listed in the mortgage agreements. Rather, during this period from December 1997 through July 1998, Sun-America and JER usually, although not exclusively, corresponded with Burke at his home address, 4 Porter’s Cove Road, Hingham, Massachusetts. Michele Lynch, a senior account manager for JER, was the individual in charge of managing the two loans on behalf of SunAmerica. Lynch obtained Burke’s home address by reviewing the files which the FDIC had provided to SunAmerica; according to Lynch, Burke’s residential address was the one used by the FDIC as the billing address.[10] Lynch confirmed with Burke that the Hingham address she had was the correct residential address.[11] Burke never complained that the notices and correspondence relating to the notes and mortgages were being sent to his residence rather than to his business address. Nor did he complain that the copies of notices were not being sent to the attorney listed in the mortgages.[12]
The summary judgment record contains a number of letters sent to Burke at his residence by or on behalf of SunAmerica. Thus, on December 9, 1997, JER sent two letters to Burke at his residence, notifying him that SunAmerica had purchased the notes and mortgages relating to the two properties. It is undisputed that Burke received both letters. On February 19, 1998, SunAmerica sent a letter to Burke at his residence, notifying him that he should advise his insurance agent to change the mortgagee clause on the insurance policies for the two properties to reflect SunAmerica’s purchase of the notes and mortgages. There is no dispute that Burke received that letter.
On May 15, 1998, JER sent two demand letters by certified mail, return receipt requested, to Burke at his *529 residence. The letters notify Burke that he is in default on the notes and mortgages securing on the properties. The letters further state the amount due on the loans, and provide that if payment is not made within 30 days, the lender may “declare all of the sums secured by the Mortgage to us to be immediately due and payable without further notice on demand, and we may invoke any of the remedies permitted by applicable law.” The letters conclude with the following:
. . . [T]he debt shall be assumed to be valid unless, within thirty (30) days of your receipt of this notice, you dispute in writing the validity of the debt, or any portion thereof, by sending written notice to the undersigned containing your mailing address and a statement indicating that you dispute the debt, or any portion thereof. If such notice is timely received by the undersigned, verification of the debt will be mailed to you.
Once again, it is undisputed that Burke received both of these demand letters. In response to these letters, Burke contacted Lynch by telephone in an attempt to negotiate a settlement of his default and to discuss the possibility of SunAmerica financing a purchase of the loan.[13] He did not however, notify Lynch in writing of a dispute about the validity of the debt. When these settlement discussions failed, JER retained the law firm of Barron & Stadfeld to commence foreclosure proceedings on the properties on SunAmerica’s behalf.
On June 29, 1998, Barron & Stadfeld sent two additional demand letters by certified mail, return receipt requested, to Burke at his residence, notifying Burke that he was in default on the notes secured by the mortgages on the two properties. Each letter advises Burke that, “(t]his is an attempt to collect a debt,” and indicates that Barron & Stadfeld would commence legal proceedings against Burke to collect the debt on the notes. The letters also provide that:
Unless you notify this office within thirty days after receipt of this notice that you dispute the validity of the debt, or any portion thereof, this office will assume the debt is valid. If within the thirty day period, you notify this office in writing that the debt or any portion thereof is disputed, we will obtain written verification of the debt and mail a copy of such verification to you.
The fact that you have thirty (30) days after the receipt of this notice to notify this office of a dispute as to the validity of all or any portion of the indebtedness, does not prevent this office from commencing legal proceedings against you during that period.
It is undisputed that Burke received both of the June 29, 1998 demand letters. In fact, on July 27, 1998, Burke responded to the letters by writing: “Please be advised that while I agree that the notes are valid, I vehemently dispute the amount of the indebtedness.” No one on behalf of SunAmerica, Barron & Stadfeld or JER responded in writing to Burke’s dispute as to the amount of indebtedness.
On July 9, 1998, Barron & Stadfeld sent four letters by certified mail, return receipt requested, to Burke at his residence. Two were addressed to him individually and the other two were addressed to him as trustee of 448 Broadway Court Realty Trust and trustee of 452 Broadway Court Realty Trust, respectively. All four letters notify Burke of SunAmerica’s intent to foreclose on Unit 448 and Unit 452, on or after August 26, 1998, under power of sale for breach of condition of the mortgages on the two properties. It is undisputed that the return receipts for the four certified letters were all signed “F.D. Burke” and returned to Barron & Stadfeld. Burke denies having received any of the four letters.
On July 14, 1998, Deputy Sheriff Kevin J. Dalton of Plymouth County served an “Order of Notice to Foreclose the Mortgage on Unit 448" and an ’’Order of Notice to Foreclose the Mortgage on Unit 452" on Burke by personally delivering copies of the notices to Burke’s residence. This delivery is shown on Deputy Sheriff Dalton’s sworn certificates of service which were filed with the Land Court. Burke denies receiving these orders of notice to foreclose mortgages at his residence.
On or about July 23, 1998, JER ordered a broker opinion of value. The opinion obtained concludes that the two properties had a range of value of $800,000 to $900,000 each or a combined value of $1.6 to $1.8 million.
On or about August 25, 1998, the Land Court (Kilborn J.) entered a judgment authorizing foreclosure on the mortgage for Unit 452. Subsequently, on or about September 16, 1998, the Land Court (Kilb-orn, J.) entered a judgment authorizing foreclosure on the mortgage for Unit 448.
The foreclosure sales were initially scheduled for August 26, 1998, at 9:00 a.m. They did not go forward at that time. Before this original date for the sales, however, SunAmerica published notice of the sales in the Cambridge Tab for three consecutive weeks, in the July21-27, July28-August3, and August 4-10, 1998, editions of the paper. On August 26,1998, a representative of Tache Auction & Sales, Inc. (“Tache”), the company retained by Barron & Stadfeld to conduct the foreclosure sales on behalf of SunAmerica, appeared in person at the properties and announced the postponement of the foreclosure sales until September 17, 1998. Tache also placed advertisements concerning the postponed foreclosure sales in The Boston Globe, and distributed copies of the advertisements to approximately 100 parties.
On September 17, 1998, SunAmerica (through Tache) conducted foreclosure sales on the properties.[14] Nine persons were in attendance; seven of the *530 nine deposited individual checks in the amount of $5000 which qualified them to bid on the properties. The high bid for Unit 448 was $301,000, and the high bid for Unit 452 was $395,000. Unit 448 was purchased by Marc Lindenbaum, and Unit 452 was purchased by Florindo DiCarlo.
Lindenbaum and DiCarlo each signed a “foreclosure auction sale agreement” (foreclosure sale agreement) on the date of the purchases, September 17, 1998. The agreements signed by Lindenbaum and DiCarlo are identical in all material respects except purchase price. Each provides that in exchange for payment by the purchaser of the full purchase price, SunAmerica will convey title to the property “by good and sufficient Foreclosure Deed” on the closing date. The penultimate paragraph of each agreement provides:
In the event that Mortgagee [SunAmerica] is unable to deliver title under the conditions hereinbefore stated or referred to, all deposits made by Purchaser shall be returned and the contract effected hereby shall cease without recourse to the parties hereto.
The closing for the sales to Lindenbaum and DiC-arlo was scheduled for October 19, 1998. On or about September 24, 1998, Burke filed his complaint against SunAmerica and JER (No. 98-4842), seeking to set aside the foreclosure sales based on his contention that SunAmerica allegedly failed to provide him with the proper notice of the sales. In connection with the complaint, Burke also sought and obtained a memorandum of lis pendens (sometimes referred to as “lis pendens”) on each of the two properties.
On or about October 15, 1998, following Burke’s recording of the lis pendens on the properties, DiCarlo and Lindenbaum, through their respective counsel, demanded that SunAmerica either convey title to the properties free of Burke’s lis pendens, or extend the time of performance beyond the scheduled closing date, until such time as the Us pendens were vacated by the court.[15]
SunAmerica declined these requests, instead offering to convey title to the respective properties to Lindenbaum and DiCarlo subject to the lis pendens, upon payment of the remaining purchase price owed. Alternatively, SunAmerica offered to refund Lindenbaum’s and DiCarlo’s $5000 deposits in accordance with the termination clause of the foreclosure sale agreements. Lindenbaum and DiCarlo refused to accept title subject to Burke’s lis pendens. Accordingly, SunAmerica tendered to them their $5000 deposits.
As indicated above, on November 2, 1998, Lindenbaum moved to intervene in the action filed by Burke against SunAmerica and JER, asserting cross-claims against SunAmerica for breach of the foreclosure sale agreement, violation of G. L. c. 93A, and specific performance of the sale agreement. On or about November 6, 1998, DiCarlo commenced a separate action against Burke and SunAmerica, raising similar claims.[16]
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact in dispute and where the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id. at 17. The nonmoving party cannot defeat a motion for summary judgment by resting on the pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
I. SunAmerica’s Motion for Summary Judgment on Burke’s Claims
Burke’s complaint seeks to set aside the foreclosure sales based on his alleged lack of notice in accordance with G. L. c. 244, §14. Burke also claims that SunA-merica handled the foreclosure sale in an improper manner, in violation of statutory requirements, and in violation of G.L.c. 93A.
A. Lack of Notice
General Laws c. 244, §14 provides in relevant part:. . .
[N]o sale under [a power of sale] . . . shall be effectual to foreclose a mortgage, unless, previous to such sale, notice thereof has been published once in each of three successive weeks, the first publication to be not less than twenty-one days before the date of sale, in a newspaper, if any, published in the town where the land lies or in a newspaper with general circulation in the town where the land lies and notice thereof has been sent by registered mail to the owner or owners of record of the equity of redemption as of thirty days prior to the date of sale, said notice to be mailed fourteen days prior to the date of sale to said owner or owners ... to the last address of the owner or owners of the equity of redemption appearing on the records of the holder of the mortgage . . .
(Emphasis supplied.)
Burke contends that SunAmerica failed to comply with G. L. c. 244, §14, because it did not mail notice to the proper address, and also did not send notice to the attorney listed in the mortgages. Section 14 requires that notice be sent “to the last address of the *531 owner or owners of the equity of redemption appearing on the records of the holder of the mortgage” (emphasis added). The statute is silent as to the meaning of the term “records.”[17] The words in a statute should be construed according to the common and approved usage of the language. E.g., Commonwealth v. Welosky, 276 Mass. 398, 401-02 (1931). “Records”has been defined as “accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language.” Black’s Law Dictionary (6th ed.) (1990).[18]
SunAmerica’s flies, derived from the FDIC and from JER’s experience with Burke’s loans, contained correspondence indicating that the Hingham address was a current residential address for Burke. SunAmerica’s flies also apparently contained documents showing that the current business address for the two trusts was Burke’s business address in Boston (c/o Vesper Properties, One Post Office Square). The statute does not specify whether a residential or business address is to be used. Consistent with the protective purposes of §14,[19] it is reasonable to interpret the statute to require the mortgagee — here SunAmerica — to send the prescribed notice to an address that the mortgagee has knowledge is a current address. Compare Bead Portfolio, LLC v. Follayttar, 47 Mass.App.Ct. 533, 534 and n. 3 (1999) (mortgagee sent notice required by G.L.c. 244, §17B to address where mortgagors no longer resided, although mortgagee had knowledge of the mortgagors’ new address; notice held deficient). The summary judgment record shows that in the six months preceding SunAmerica’s §14 letter of July 9, 1998, SunAmerica (itself or through its agent JER) on a number of occasions had sent correspondence to Burke concerning the trust properties and the mortgages at his Hingham residential address, that he had received each of these letters, and had never complained about SunAmerica’s use of the Hingham address; the last of such correspondence was sent only ten days before July 9. In the circumstances presented, SunAmerica has demonstrated that as a matter of law it achieved sufficient compliance with the notice requirements of §14.[20]
B. Commercial Unreasonableness
In the alternative, Burke contends the foreclosure sales should be set aside because they were was conducted in a commercially unreasonable manner. Burke bases his claim on “a whole host of commercially unacceptable actions, the totality of which evidence SunAmerica’s bad faith.” However, he points primarily to the asserted inadequacy of the purchase price for each property. The argument is not persuasive.
Under Massachusetts law, the mortgagor has the burden of proving commercial unreasonableness. Chartrand v. Newton Trust Co., 296 Mass. 317, 320 (1936). “A low price for the collateral does not by itself indicate bad faith or lack of diligence in disposition of mortgaged real estate.” Pemstein v. Stimpson, 36 Mass.App.Ct. 283, 287, further app. rev, denied, 418 Mass. 1103 (1994). Accord, Sher v. South Shore Natl. Bank, 360 Mass. 400, 402 (1971). “If the statutory norms . . . governing foreclosure of real estate mortgages have been adhered to, Massachusetts cases have generally regarded that as satisfying the fiduciary duty of a mortgagee to deal fairly with the mortgaged property, unless the mortgagee’s conduct manifested fraud, bad faith, or the absence of reasonable diligence in the foreclosure sale process.” Pemstein, 36 Mass.App.Ct. at 286 (citations omitted). “Absent evidence of bad faith or improper conduct, a mortgagee is permitted to buy the collateral at a foreclosure sale as ‘cheaply’ as it can, Cambridge Sav. Bank v. Cronin, 289 Mass. 379, 383 ... (1936), and ‘[m]ere inadequacy of price will not invalidate a sale unless it is so gross as to indicate bad faith or lack of reasonable diligence.’ Chartrand, [supra,] 296 Mass. at 320 (emphasis added).” Resolution Trust Corp. v. Carr, 13 F.3d 425, 430 (1St Cir. 1993.)
In this case, the two properties sold for $301,000 and $395,000 respectively, for a combined amount of $696,000. Based on the broker opinion of value, one of the properties sold for 35% of its estimated value of between $800,000 to $900,000, and the other sold for 46% of its estimated value. The combined selling price of the property, $696,000, comprises 41% of the estimated combined value of between $1.6 million and $1.8 million. In canvassing Massachusetts case law, the court in the Resolution Trust case found that “a price deficiency of as much as 39% of the fair market value can support the granting of a dispositive motion [in favor of the mortgagee].” Resolution Trust Corp. v. Carr, supra at 430. Standing alone, the 41% differential in this case does not come close enough to the “boundaries of‘gross inadequacy’ ” to withstand summary judgment. See id.
Burke further argues that even if this monetary disparity is insufficient in itself to establish bad faith, the totality of circumstances indicates bad faith. Specifically, to support his claim of commercial unreasonableness, Burke contends that: (1) SunAmerica did not furnish him with information about the FDIC’s application of his CD funds; (2) SunAmerica did not respond to his letter disputing the indebtedness; (3) SunAmerica foreclosed Without notice; and (4) SunA-merica did not notify Burke that the foreclosure sale had been postponed.
Burke contends that in response to the May 15, 1998 demand letters sent by JER, he orally questioned Lynch with respect to the application of his CD funds, and that the issue of the application of his CD funds prompted him to dispute the amount of indebtedness cited in SunAmerica’s notices. He asserts that SunAmerica’s and JER’s failure to respond to these *532 questions are indicative of bad faith. The argument fails on a number of grounds.
First, it is not self evident — and Burke offers little explanation — how SunAmerica was even in a position to explain in 1998 the FDIC’s treatment of the CD funds in May 1993, four and one-half years before SunAmerica purchased the loans from the FDIC, and five years before Burke raised the issue.[21] Second, even assuming SunAmerica could have done so, Burke waived his right to receive that explanation. SunAmerica’s formal demand letter dated May 15, 1998,[22] and received by Burke on May 19, 1998, states:
. . . the debt shall be assumed to be valid unless, within thirty (30) days of your receipt of this notice, you dispute in writing the validity of the debt, or any portion thereof, by sending written notice to the undersigned containing your mailing address and a statement indicating that you dispute the debt, or any portion thereof. If such notice is timely received by the undersigned, verification of the debt will be mailed to you. In addition, if said notice is sent to the undersigned, any debt collection efforts shall cease until this information has been mailed to you. Your failure to dispute the validity of the debt cannot be construed as an admission of liability against you in court.
(Emphasis added.) Burke made no effort to dispute in writing his amount of indebtedness in response to this letter within thirty days. He apparently takes the position, however, that his failure to respond is irrelevant because Thomas Bennett, the Barron & Stadfeld attorney representing SunAmerica in its collection and foreclosure efforts, sent Burke a formal notice of default dated June 29, 1998, which contained a paragraph similarly stating that if written notice disputing the debt were sent within thirty days, a written verification of the debt would be sent to Burke. (See p. 7 above.) Burke states that he did respond to the Bennett default notice by sending Bennett a letter dated July 27, 1998, in which he disputed the debt,[23] but neither Bennett nor SunAmerica mailed him a verification of the debt and instead proceeded with the foreclosure.
The nonresponse to Burke’s July 27, 1998, letter does not rise to the level of bad faith, or more particularly, does not create a disputed factual issue about bad faith. As indicated previously, Bennett’s June 29 notice of default ends with the following: “The fact that you have thirty (30) days after the receipt of this notice to notify this office of a dispute as to the validity of all or any portion of the indebtedness, does not prevent this office from commencing legal proceedings against you during that period.” (See p. 7 above.) In contrast to Michele Lynch’s May 15 demand letter, there was no commitment made to cease all debt collection efforts until a response was made to a letter disputing the debt. By the time Burke received the June 29 notice, the thirty days following Lynch’s letter of May 15 had passed with no written response from Burke. SunAmerica was therefore in a position to assume the debt was valid and proceed with foreclosure, which was the course of action it chose to follow. The second opportunity given to Burke in Bennett’s default notice to dispute the debt does not change this reality. Having failed to challenge the amount of his indebtedness within the time and in the manner prescribed by SunAmerica’s original demand letter, Burke cannot now claim that SunAmerica’s later failure to provide a verification of the debt is evidence of bad faith “of an active and conspicuous character”[24] sufficient to invalidate the foreclosure sale.
Burke’s additional claim that bad faith is shown by SunAmerica’s failure or refusal to give him notice of the foreclosure sale must be rejected for the reasons discussed previously (see pp. 12-14); there was no failure to give the proper notice. Burke’s argument about the lack of notice that the foreclosure sale had been postponed also lacks merit. “It has long been accepted practice in Massachusetts that, while details of the initial auction must be provided by written notice to the appropriate parties and published in a newspaper in accordance with G.L.c. 244, §§11-17B, a postponement of the sale may be announced by public proclamation to those present at the auction site ...” Fitzgerald v. The First National Bank of Boston, 46 Mass.App.Ct. 98, 100 (1999), citing Way v. Dyer, 176 Mass. 448, 450 (1900). There is no dispute that a representative of the auctioneer went to the properties on the date of the originally scheduled foreclosure sale and announced the postponed date.
Burke’s challenge to the manner in which the foreclosure sale was conducted concludes with a long discussion of the ways in which SunAmerica, its servicing agent JER, and its attorney fell short of the standards described by Burke’s expert witness. The summary judgment record demonstrates, however, that SunAmerica satisfied the notice and publication obligations imposed by G.L.c. 244, §14, as well as, apparently, the Fair Debt Collection Practices Act, 15 U.S.C. §1692g. SunAmerica also advertised the foreclosure sales once they were postponed, and seven independent persons attended the sale and paid the required deposit. There is no evidence of manifest “fraud, bad faith, or the absence of reasonable diligence in the foreclosure sale process.” Pemstein, supra, 36 Mass.App.Ct. at 286. SunAmerica is entitled to summary judgment on Burke’s claims concerning the commercial reasonableness of the foreclosure sale.
C. Violation of G.L.c. 93A and Unfair Debt Collection Practices:[25]
Burke argues that SunAmerica’s efforts to collect his debt and the manner in which it handled the foreclosure sale violated G.L.c. 93A. It is clear, however, that the c. 93A claim is premised on the same facts and circumstances that define Burke’s claims of *533 violation of G.L.c. 244. §14, and of commercial unreasonableness relating to the foreclosure sales. As the discussion above indicates, I conclude that these latter two claims lack merit. Since there is no separate basis for the c. 93A claim, SunAmerica is also entitled to summary judgment on Counts I and II of the complaint.
II. Lindenbaum’s and DiCarlo’s Motions for Summary Judgment Against Burke
Lindenbaum and DiCarlo have filed claims against Burke alleging intentional interference with contractual relations.[26] They contend that Burke’s sole purpose of filing a lawsuit against SunAmerica and subsequently obtaining memoranda of lis pendens from this court was to provide Burke an opportunity to redeem his mortgage indebtedness. That, they assert, is an improper purpose which establishes their claim for intentional interference with contractual relations.
To prevail on a claim for intentional interference with contractual relations, plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break the contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions. G.S. Enterprises, Inc. v. Falmouth Marine Corp., 410 Mass. 262, 272 (1991). Thus, in the context of summary judgment, Lindenbaum and DiC-arlo have the burden of showing that there are no genuine issues as to any material facts related to each of these substantive elements of the intentional interference claim. They have not satisfied their burden.
“[S]omething more than intentional interference is required” to make out the tort. Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 412 (1991), S.C., 412 Mass. 703 (1992), quoting United Truck Leasing Corp v. Geltman, 406 Mass. 811, 815 (1990). The additional ingredient is improper conduct, which may include ulterior motive or wrongful means. Id. Thus, if a particular act interferes with contractual relations of a plaintiff and a third party, it is necessary to consider whether the act had an improper motive or constituted an improper means. G.S. Enterprises, supra, 410 Mass. at 273. The propriety of an actor’s motives in a particular setting necessarily depends on the attending circumstances, and therefore must be evaluated on a case by case basis. Id.
In this case, Lindenbaum and DiCarlo contend that Burke filed a lawsuit as a means of interfering with their contracts with SunAmerica. A party is justified in interfering with a third-party’s contract with another by filing a lawsuit in a good faith effort to assert legally protected rights. Id., citing Restatement (Second) of Torts §773 (1979). However, instituting a lawsuit “is wrongful if its initiator does not have probable cause to believe that the suit will succeed, and is acting primarily for a purpose other than that of properly adjudicating his claims.” Id., citing Restatement (Second) of Torts §674(a) (1977). Thus, whether Burke acted in good faith in initiating the lawsuit is crucial in determining the validity of Lindenbaum’s and DiCarlo’s claims.
Questions concerning a party’s intent or state of mind represent questions of fact that are generally difficult to resolve by summary judgment. See, e.g., Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 439-40 (1995). While SunAmerica is entitled to summary judgment on Burke’s claims contesting the validity of the foreclosure sales, the allowance of its summary judgment motion does not directly translate into a conclusion that Burke acted with improper purpose in bringing his case against SunAmerica. I am not in a position to determine that as matter of law, Burke acted in bad faith or for improper motives when he filed his complaint. These are questions of fact on which Burke is entitled to a trial. Lindenbaum’s and DiCarlo’s motions for summary judgment should be denied.
HI. SunAmerica’s Motion for Summary Judgment as to all Claims Filed by Lindenbaum and DiCarlo
Lindenbaum and DiCarlo (sometimes referred to collectively as “the purchasers”), as successful high bidders at a mortgage foreclosure auction sale undertaken by SunAmerica, have filed claims against Sun-America for specific performance, breach of contract (including breach of the implied covenant of good faith and fair dealing), and Chapter 93A violations. Lindenbaum’s and DiCarlo’s contract-based claims are premised on the following language in the foreclosure sale agreements:
The premises are to be conveyed by good and sufficient Foreclosure Deed (the “Foreclosure Deed”), running to Purchaser or his nominee, subject to matters, if any, set forth or referred to in the Mortgagee’s Sale of Real Estate and such further matters announced by the Auctioneer at the time of the sale, on October 19, 1998, at 9:00 a.m. (the “Closing Date”) at the offices of Barron & Stadfeld, .P.C., . . . upon payment by Purchaser of the total sum of [amount due inserted] in bank or certified check, of which FIVE THOUSAND DOLLARS AND 00/100 ($5,000.00) have this day been paid to Barron & Stadfeld, P.C., as a deposit to bind the sale . . .
SunAmerica moves for summary judgment on the contract-based claims, contending that the plain language of the termination clause in each foreclosure sale agreement relieves it of any continuing obligation to convey title to the purchaser. The termination clause upon which SunAmerica relies states the following:
In the event that Mortgagee is unable to deliver title under the conditions hereinbefore stated or referred *534 to, all deposits made by Purchaser shall be returned and the contract effected hereby shall cease without recourse to the parties hereto.
SunAmerica also moves for summary judgment on the purchasers’ claims based on SunAmerica’s alleged post-sale negotiations with Burke; it argues there is no evidence that it or any of its agents entered into any such post-sale collusive bargain with Burke.
In light of the termination clause in the foreclosure sale agreements, the agreements as a whole do not represent an “absolute and unqualified” contract to convey. See Sawl v. Kwiatkowski, 349 Mass. 712, 714 (1965), quoting Old Colony Trust Co. v. Chauncey, 214 Mass. 271, 273 (1913); J.J. Newberry Co. v. Shannon, 268 Mass. 116, 118 (1929). A termination clause “means that if it turns out that without fault on the part of the . . . [seller] subsequent to the execution of the contract [it has] a defective title, then, after refunding payments made, all obligations of both parties shall cease.” Berry v. Nardozzi, 362 Mass. 145, 149 (1972). Thus, a seller who is unable to convey as agreed is protected by such a provision except where it has impaired the title after entering the contract to sell. Lucier v. Williams, 323 Mass. 458, 461-62 (1948). In other words, “such a clause is of no protection to an owner who is not acting in good faith and does not intend to carry out the agreement.” Berry v. Nardozzi, supra, 362 Mass. at 149, citing Moskow v. Burke, 255 Mass. 563, 567-68 (1926).
SunAmerica argues that it is entitled to the benefit of the termination clause. It points out that after Burke filed his complaint on September 24, 1998 and obtained a lis pendens on each of the properties, it could convey title only subject to the lis pendens order. While a memorandum of lis pendens may not be a true cloud on title, neither Lindenbaum nor DiCarlo was willing to take title subject to it. Rather, both purchasers offered to take title only if the properties were free of the lis pendens (or in Lindenbaum’s case, if he were indemnified against any of Burke’s claims), or to extend the closing date until after the lis pendens memoranda were vacated by the court. SunAmerica’s position is that under the terms of the agreements, it had no obligation to accept either alternative offered by the would-be purchasers, but was entitled to return their deposits and terminate the transaction. I agree.
The termination clause in the foreclosure sale agreement is unambiguous. There is no language requiring SunAmerica to “clear” the supposed cloud on title represented by the lis pendens before offering a deed to the purchasers. SunAmerica may permissibly insist that the contract be enforced as written. See, e.g., Lucier v. Williams, supra, 323 Mass. at 462. Old Colony Trust Co. v. Chauncey, 214 Mass. 271, 272-74 (1913); Sachs v. Hirshom, 16 Mass.App.Ct. 704, 705 (1983).
Lindenbaum and DiCarlo do not contend the foreclosure sale agreements are unclear in their meaning. They rather argue that in the circumstances, there is at least a genuine issue of material fact concerning whether SunAmerica acted in good faith when it returned their deposits and refused to accept one of their proferred solutions to the problems created by the memoranda of lis pendens. As evidence for the argument, they point out that following the foreclosure sales, Burke’s attorney contacted Thomas Bennett, the attorney representing SunAmerica, and the two lawyers had a discussion concerning Burke’s intent to file a lawsuit and seek memoranda of lis pendens; Lindenbaum also relies on a note produced by JER from its files relating to Burke’s interest in getting back his properties.[27] Lindenbaum and DiCarlo find these sources to be sufficient building blocks on which to construct an argument of improper collusion on the part of SunAmerica and Burke which destroys every assertion of good faith that SunAmerica advances. I disagree.
It is undisputed that Burke never communicated with Michele Lynch or any other representative of JER or SunAmerica about the possibility of vacating or “undoing” the foreclosure sales and then redeeming the properties. The purchasers are correct that the absence of a direct communication is not dis-positive: obviously, Burke’s attorney is his agent, and SunAmerica’s attorney holds the same position in relation to SunAmerica. Nevertheless, the pages of the Bennett deposition relied on by the purchasers (Bennett deposition, pp. 34-36, 151-53) indicate only the following: (1) Burke’s attorney notified SunAmerica’s attorney that he believed notice to the mortgagor had not been properly given in connection with the foreclosure sales, and that Burke was going to file a lawsuit pressing this claim; and (2) SunAmerica’s lawyer indicated in response that if the foreclosure sales were defective or the purchasers declined to accept title, SunAmerica would be willing to permit Burke to redeem the properties by paying off the notes — an action Burke would be legally entitled to take in any event in connection with a reforeclosure on the properties.
This is not the stuff from which a bad faith collusion claim may be made. What reasonably appears to be reflected here is that Bennett on behalf of SunAmerica is reacting to a new reality of which he is just being informed — Burke’s impending lawsuit which will challenge the foreclosure sales and seek memoranda of lis pendens — and is then reviewing the possible consequences of that new reality. Bennett’s discussion of the circumstances under which SunAmerica would be willing to permit Burke to redeem his properties is nothing but an accurate statement of what could happen if Burke prevailed in his challenge to the foreclosure sales on notice grounds, or if the purchasers declined to accept title because of the lis pendens. There is no indication that Bennett encouraged *535 Burke’s attorney to file the lawsuit or agreed to it in any way.
The purchasers suggest that one can infer SunA-merica acquiesced in Burke’s course of action by not fighting the lis pendens. Such a fight would have been futile. There can be no question that Burke’s lawsuit against SunAmerica asserts “a claim of right to title to real property.” G.L.c. 184, §15. Since this is so, Burke was entitled to a memorandum of lis pendens on each of the properties at issue. Quite apart from the lis pendens, SunAmerica has been defending its position in Burke’s action vigorously and consistently, as its motion for summary judgment on all claims in Burke’s complaint demonstrates.[28]
The purchasers, or at least Lindenbaum, makes the argument that a memorandum of lis pendens is not a true cloud on title, but a temporary restriction on the seller’s ability to convey clear title. In his view, this means that SunAmerica was obligated to take steps to resolve the lis pendens before it could properly claim an inability to deliver good title to the purchasers. The rationale for this argument is elusive. The foreclosure sale agreements between SunAmerica and the purchasers provided for a closing date of October 19, 1998, and also included the termination clause. The record reflects that on or about that date, SunAmerica indicated the purchasers could either have their deposits returned to them or take title subject to the lis pendens, upon payment of the balance of the purchase price. The agreements did not call upon SunAmerica to adopt the options the purchasers proposed — either to postpone the closing with the purchasers indefinitely while it defended against Burke’s lawsuit or to indemnify the purchasers if they did take title subject to the lis pendens.
Nor do principles of equity demand such a result. If the purchasers were of the view the memoranda lis pendens were not a serious problem because Burke’s claims about the foreclosure sales lacked merit, they were free to complete the purchases with the lis pen-dens still in place, and wait for resolution of Burke’s lawsuit. If Burke’s challenges to the sales were rejected, the purchasers would then hold clear title to the respective properties. If the sales were in fact invalidated on the grounds asserted by Burke, viz., that SunAmerica had not given proper notice to the mortgagor or had conducted the sales in a commercially unreasonable manner, the purchasers would have been in a position to seek recovery from SunA-merica regardless of whether SunAmerica agreed to indemnify.
SunAmerica also moves for summary judgment on the purchasers’ claims under G.L.c. 93A. These claims are premised on the same conduct that forms the basis for the purchasers’ rejected contract-based and post-foreclosure sale claims discussed above. For the reasons stated in that discussion, there is simply no information in the record to support factually a claim that SunAmerica acted unfairly or deceptively.
In sum, I conclude that SunAmerica is entitled to summary judgment on all the claims raised against it by Lindenbaum and DiCarlo. It follows from this that Lindenbaum’s motion for partial summary judgment motion on its claims against SunAmerica must be denied.
ORDER
For the foregoing reasons, it is hereby ORDERED that SunAmerica’s motion for summary judgment as to the claims of Francis D. Burke be ALLOWED; that the motions for summary judgment of Lindenbaum and DiCarlo on their respective claims against Burke be DENIED; that SunAmerica’s motion for summary judgment as to all claims asserted against it by Lindenbaum and DiCarlo be ALLOWED; and that Lindenbaum’s motion for partial summary judgment against SunAmerica be DENIED.

Unless otherwise indicated, the facts set forth in the text below are undisputed. For purposes of ruling on the various summary judgment motions, I have resolved all factual disputes in favor of the nonmoving parties.

Although each property is called a condominium “unit,” each is a multi-stoiy building containing six apartments.

Each note actually states that interest is payable in monthly installments beginning January 1, 1988, but that principal payments are to commence January 1, 1989. In light of the fact that the notes are dated December 2, 1988, it seems obvious that the January 1, 1988 date is a typographical error; the correct date for beginning to pay interest is January 1, 1989.

Specifically, the notice clause states:
That wherever notice, demand or a request may properly be given to the Mortgagor or his successor in title under this Mortgage, the same shall always be sufficient to serve as a notice, demand or request hereunder if in writing and posted in the United States mail by regular mail, postage prepaid, addressed to the Mortgagor or his successor in title at the address given in this Mortgage as the Mortgagor’s address or the business address of the Mortgagor or his successor in title last known to the Mortgagee, and any such notice, demand or request shall be treated as having been given upon such deposit in the United States mails, and a notice so addressed shall always be a sufficient notice, notwithstanding a change in the ownership of the equity of redemption of the property, whether or not consented to by the Mortgagee or the non-delivery of the same by United States mails and where more than one person constitutes the Mortgagor, one notice sent to the address given in this Mortgage as the Mortgagor’s address or the last known business address of any one of them shall constitute sufficient notice to all. A copy of any notice to mortgagor shall be sent to:
David Johnson, Esq.
*536 Gadsby & Hannah
One Post Office Square, Boston, MA 02109

Some years before 1997, Burke retained Charles Bene of the Commonwealth Group to assist him in his negotiation with the FDIC following his default on the notes. Included in the FDIC files given to SunAmerica were letters between the FDIC and Bene, acting on Burke’s behalf. One such letter, dated April 11, 1995, was copied to Burke at his home.

 Burke denies that he or his wife gave verbal confirmation that Burke’s residence was a correct address to send any legal notices under the notes or mortgage agreements. SunAmerica's claim appears to be only that Lynch obtained confirmation she had the correct address for Burke’s residence, not confirmation that this was the proper address for legal notice. In any event, whatever factual dispute may exist on the point is not material.

It appears to be undisputed that by the spring of 1998, David Johnson was no longer with Gadsby & Hannah.

The precise nature of these negotiations is irrelevant for the purposes of this motion. However, Burke contends that throughout the negotiation process, he communicated and corresponded with Lynch from the business address of the two trusts at One Post Office Square in Boston.

Burke states he learned of the foreclosure sale on September 17, 1998 when his daughter, who lived in an apartment in one of the subject properties, called him on his car phone as the foreclosure sale was in progress.

Lindenbaum asserts that he offered to take title to Unit 448 provided that SunAmerica either (a) indemnify him from Burke’s claims in the instant lawsuit, or (b) extend the time for performance until Burke’s claim was disposed of in favor of SunAmerica.

 Additional facts are set out below in the discussion section of this Memorandum.

It is not reasonable to assume, as Burke appears to do, that “records" means the actual mortgage instrument itself as the final paragraph of §14 (partially quoted above) demonstrates, the Legislature was certainly willing and able to use the word “mortgage" when that is what it meant. Cf. Negron v. Gordon, 373 Mass 199, 203 (1977).

The word “record" is defined to mean “an account, as of information or facts, set down especially in writing asa means of preserving knowledge; something on which such an account is based." The American Heritage Dictionary of the English Language (3d ed.) (1992), p. 1511.

Section 14 is designed to protect the interests of those affected by the foreclosure sale, including, obviously, persons holding an interest in the equity of redemption. See Hull v. Attleborough Sav. Bank, 33 Mass.App.Ct. 18, 25 (1992). Cf. Framingham Sav. Bank v. Turk, 40 Mass.App.Ct. 384, 386-87 (1996).

Despite the presence of signed return receipts, Burke asserts that he never received the foreclosure notices. According to the plain language of G.L.c. 244, §14, however, proof of actual receipt of the notice is unnecessary. The Appeals Court has interpreted G.L.c. 244, §14, to be “satisfied by mailing,” and has stated that nonreceipt is irrelevant. Hull v. Attleboro Sav. Bank, supra, 33 Mass.App.Ct. at 25. Because SunA-merica has established that the foreclosure notices were in fact sent, the fact that Burke allegedly did not receive them is immaterial. See Id.
A final point. SunAmerica alleges that apart from G.L.c. 244, §14, the parties modified the notice provisions in the mortgage agreements by their course of dealing. In light of my conclusion that SunAmerica complied with c. 244, §14, I do not reach the issue.

Moreover, the summary judgment record contains copies of correspondence between the FDIC and Burke’s representative in 1993 which appears to provide an explanation of how the CD funds were allocated between principal and interest on each loan, which was the focus of Burke's concern. (See Affidavit of Peter M. Coppinger, Tab F, Bates stamp BUR 0037, BUR 0038.) One is left only to wonder why Burke’s representative did not follow up on the matter with the FDIC in 1993 if the explanation was unsatisfactory.

The letter was sent by Michele Lynch of JER on behalf of SunAmerica.

Burke's letter states in its entirely, “Please be advised that while I agree that the notes are valid, I vehemently dispute the amount of the indebtedness.” It bears note that Burke makes no specific mention of his concern regarding the application of his CD funds in this letter.

Pemstein v. Stimpson, 36 Mass.App.Ct. 283, 287 (1994).

Burke’s complaint contains a separate claim complaining of unfair debt collection practices, but it does not appear from the complaint or any of the papers he has filed in opposition to summary judgment that Burke seeks to raise a claim under the Fair Debt Collection Practices Act, 15 U.S.C. §1692, or any related statute. Rather, Burke’s complaint about debt collection appears to be one facet of his more general c. 93A claim. I treat the two together.

Lindenbaum, who intervened in Burke’s case against SunAmerica and JER, asserts his claim against Burke as a counterclaim in that suit. DiCarlo’s claim is Count I of his separate complaint against Burke and SunAmerica.

The handwritten note is dated October 8, 1998, and states in relevant part:
* owner filed lis pendens to try to negotiate getting properties back
* he [Burke] is currently negotiating w/buyer from 3rd party sale
* offer to us on our property is a good settlement
* [illegible] we settle, lawsuit will go away
* [illegible] referred to outside counsel to ensure any court dates are met etc.
The note is written on paper with the name Karen D. Schnurr on it; Schnurr is apparently an employee of JER. There is no evidence whether Schnurr or someone else wrote the note, but assuming the note reflects a telephone or other conversation between Schnurr or someone at JER and another person, I see no evidence-as to who that other person might be. At this time, it is impossible to determine whether the note would be admissible in evidence as a business record of JER or admission of SunAmerica, which makes its consideration for summary judgment purposes problematic. See Mass.R.Civ.P. 56(c), (e). See also Madsen v. Erwin, 395 Mass. 715, 719 (1985) (affidavits used to support or oppose summary judgment shall set forth such facts as would be admissible in evidence). But if I assume the note would be admissible, this does not assist in explaining its contents.

The purchasers do not fare any better with the JER note. While it plainly concerns the Burke loans and Burke’s mortgaged Cambridge properties, as indicated previously, there is no indication of what the note memorializes — who was speaking or writing to whom. Furthermore, while the note speaks of settling as a means of disposing of the lawsuit, no settlement has occurred to date. It is hardly a secret that SunAmerica’s primary interest in this case is to have its loans fully repaid, not to purchase two condominium properties in Cambridge.